ESPINOSA, J., dissenting.
The majority concludes that the habeas court properly granted the petition for **222 *125 a writ of habeas corpus filed by the petitioner, Michael Skakel, because his attorney at his criminal trial, Michael Sherman, provided ineffective assistance of counsel when he failed to follow up on a passing reference to a possible alibi witness by another witness, Georgeann Dowdle, during her grand jury testimony. The majority further concludes that there is a reasonable probability that, if not for this supposed deficient performance, the petitioner would have been acquitted. I agree with and join Justice Eveleigh's dissenting opinion, in which he thoroughly and persuasively explains why this conclusion is simply untenable. I write separately in order to highlight the continued and disturbing practice, as I discussed in my dissenting opinions in State v. Santiago , 318 Conn. 1, 388, 122 A.3d 1 (2015) ( Santiago II ), and Lapointe v. Commissioner of Correction , 316 Conn. 225, 439, 112 A.3d 1 (2015), of certain justices of this court ignoring the law and fabricating facts in order to reach their desired result. On this occasion, the majority goes even further and ignores and distorts the policies and rules governing motions for reconsideration that have previously guided this court. Specifically, the majority has allowed the petitioner to use a motion for reconsideration to judge shop and to obtain an unprecedented second bite at the apple. Finally, I write to emphasize that the petitioner has received more than due process, and, at the very least , the effective assistance of counsel to which he is constitutionally entitled.
I first address the majority's role as an enabler of the petitioner's attempt to judge shop, which requires a review of the circumstances surrounding the petitioner's motion for reconsideration. This court's decision in Skakel v. Commissioner of Correction , 325 Conn. 426, 159 A.3d 109 (2016), was released on December 30, 2016. The court was divided, with four justices concluding that the judgment of the habeas court granting **223 the petition for a writ of habeas corpus should be reversed, and three justices contending that the judgment of the habeas court should be affirmed. Justice Zarella authored the majority opinion, in which Justice Eveleigh, Justice Vertefeuille and I joined. Justice Palmer wrote a dissenting opinion, in which Justice McDonald joined, contending, among other things, that Sherman had provided ineffective assistance of counsel when he disregarded and failed to follow up on Dowdle's grand jury testimony that she and her "beau" were together at her parents' home on the night that Martha Moxley (Martha) was murdered, when she heard the voices of her brother, James Terrien, and her cousins, several of the Skakel brothers. See id., at 542, 587-88, 159 A.3d 109 (Palmer, J. , dissenting). Justice Palmer also concluded that the petitioner was prejudiced by Sherman's deficient performance. Id., at 618, 159 A.3d 109. Justice Robinson authored a concurring and dissenting opinion in which he agreed with Justice Palmer that Sherman's failure to follow up on Dowdle's grand jury testimony constituted deficient performance. Id., at 531, 159 A.3d 109 (Robinson, J. , concurring in part and dissenting in part).
In addition to being the date that our decision in Skakel was released, December 30, 2016, was Justice Zarella's last day as a member of this court. Because Justice Zarella intended to take a position at a private law firm, he was not eligible, under the policy of this court, to continue to participate in cases that he had heard while a member of the court, as he would have been entitled to do if he had simply retired from full-time active service. See General Statutes § 51-207 (b).
On January 6, 2017, the petitioner filed a "[m]otion for reconsideration and/or reargument *126 and request for en banc hearing or summoning of replacement member of panel." The petitioner contended that, because any party whose case was heard en banc by a seven member panel normally would be entitled to have his motion **224 for reconsideration heard en banc, he was entitled to have his motion for reconsideration heard by a seven member panel. To support this contention, he relied on Practice Book § 71-5,[1] which provides in relevant part: "A motion for reconsideration shall be treated as a motion for reconsideration en banc when any member of the court which decided the matter will not be available, within a reasonable time, to act on the motion for reconsideration." In addition, the petitioner relied on General Statutes § 51-209,[2] which provides that a majority **225 of judges on an appellate panel is required to change a prior judgment of any court. In addition, § 51-209 requires that, when an appellate panel considering a case is evenly divided, "the court shall reconsider the case, with or without oral argument, with an odd number of judges." The petitioner contended that, pursuant to these procedural rules, this court was required to "summon a replacement for Justice Zarella" in the event that the vote of the six remaining justices was evenly divided on his motion for reconsideration.
Substantively, the petitioner contended in his motion for reconsideration that the majority had incorrectly applied the governing legal standard when it concluded that Sherman's failure to follow up on Dowdle's reference to her "beau," later identified as Denis Ossorio, did not constitute deficient performance. In support of this claim, the petitioner simply parroted the arguments that Justice Palmer had made in his dissenting opinion.
On January 17, 2017, the respondent, the Commissioner of Correction, filed an *127 opposition to the petitioner's motion for reconsideration. The respondent urged this court to "reject the petitioner's efforts to engineer the composition of the panel that could overturn the appellate judgment against him by requesting that a new member of the panel be appointed in lieu of Justice Zarella ...." The respondent also contended that reconsideration was not warranted because the petitioner made no claim that this court had overlooked any fact or significant legal authority when it rendered its decision. Rather, the petitioner simply disagreed with the decision.
I strongly agree with the respondent on both counts. Under the specific circumstances of the present case-in which the original opinion of the court was divided four to three, a justice in the majority left the court **226 after the opinion was released and the petitioner subsequently filed a motion for reconsideration in which he made no claim of clear error or omission in the original decision, but simply reasserted arguments that the majority previously had rejected-no policy or rule of procedure weighs in favor of, much less requires, adding a seventh judge to the panel on a motion for reconsideration.
Practice Book § 71-5 dates from a time when the standard practice of this court was to hear appeals in panels of five, and the rule presumes that the appeal was not originally heard by an en banc panel. When an appeal has been heard by an en banc panel, and a member of the panel has subsequently left the Judicial Branch, this court has never required that a subsequent motion for reconsideration must be heard by a panel of seven. For example, no judge was added to the reconsideration panels in Tomick v. United Parcel Service, Inc. , 324 Conn. 470, 153 A.3d 615 (2016), or State v. Drupals , 306 Conn. 149, 49 A.3d 962 (2012). In Tomick , a panel of six justices heard the appeal: Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald and Robinson. The motion for reconsideration en banc was ready on January 26, 2017, at which time Justice Zarella was no longer with the Judicial Branch. I was added to the panel to make six. Justice Vertefeuille was not added to the panel, and there is no indication that she was disqualified from acting in the case. In Drupals , the case originally was heard by an en banc panel, including Justice McLachlan. After he left the Judicial Branch, the motion for reconsideration en banc was denied by a panel of six justices: Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, Harper and Vertefeuille. No one was added to the panel, despite the request for reconsideration en banc. In addition to these cases, in Harris v. Bradley Memorial Hospital & Health Center, Inc., 306 Conn. 304, 50 A.3d 841 (2012), **227 cert. denied, 569 U.S. 918, 133 S.Ct. 1809, 185 L.Ed. 2d 812 (2013), a panel of five heard the original appeal: Justices Palmer, Zarella, McLachlan and Harper and Judge Gruendel, who had been summoned from the Appellate Court because the remaining justices of this court were disqualified. A motion for reconsideration en banc was filed after Justice McLachlan's departure from the court, and was heard and denied by the remaining four panel members.
The court presumably has followed this practice because the primary function of a motion for reconsideration en banc, namely, "to secure or maintain uniformity of decision"; Practice Book § 71-5 ; simply has no relevance when the original appeal was heard by an en banc panel of seven justices. Rather, that function comes into play only when there is a possibility that the same court could reach two divergent results with respect to the same issue because of the different composition of the panels addressing the issue. For example, if the vote of a panel of five justices were *128 divided three to two on an issue, the same issue were to arise in a subsequent case, and two of the three justices in the majority in the first case were to be replaced by the two justices who did not hear that case, the second panel could split in the other direction. When a panel of seven justices hears an appeal, however, the parties are assured that a majority of the entire court, as constituted at the time of the original decision, was in agreement about the result. I would note that it has been the policy of this court since 2009 to hear cases en banc whenever possible.
Thus, when a motion for reconsideration is filed after a case has been heard by a panel of seven justices and, for some reason, an original panel member is no longer available, the primary function of adding a new judge or justice to the panel would not be to secure uniformity of decision, but simply to allow a disappointed party **228 to attempt to persuade the newly added judge or justice to vote differently than the departed justice. What Practice Book § 71-5 most assuredly was not intended to encourage or to allow, however, is judge shopping by a disappointed party. Similarly, the provision of § 51-209, requiring that "[w]henever the Supreme Court is evenly divided as to the result, the court shall reconsider the case ... with an odd number of judges," was not intended to allow a party to seek a different panel after a closely divided en banc panel has decided an appeal and a justice in the majority has departed from the court. Rather, it was intended only to ensure that the parties can obtain an appellate decision affirming or reversing the judgment under review in the first instance.
In support of its contention to the contrary, the majority states that "the decision to add Justice D'Auria to the panel in the present case is consistent with the practice of every other sister state court that has addressed the issue posed by the petitioner's motion, that is, whether to add a judge to a panel when an original panel member was unable to participate in the resolution of a timely filed motion for reconsideration." (Emphasis in original.) Part II of the majority opinion. The majority cites five cases that, in its view, support this claim. In one of those cases, however, there is no evidence that the members of the original panel were evenly split on the motion for reconsideration. See Commonwealth v. Franklin , Docket No. 12-P-569, 2015 WL 4663516 (Mass. App. August 7, 2015). In another case, the decision to grant reconsideration and to overrule the prior decision was not based solely on the fact that a new justice had been added to the reconsideration panel; rather, several justices changed their votes. Compare State v. Eriksen , 172 Wn. 2d 506, 259 P.3d 1079 (2011) (Justices Fairhurst, J. Johnson, Stephens and Wiggins and Chief Justice Madsen in majority and Justices **229 Alexander, Owens, C. Johnson and Chambers dissenting), with State v. Eriksen , 170 Wash.2d 209, 241 P.3d 399 (2010) (Justices Sanders, C. Johnson, Chambers, Owens, J. Johnson and Stephens in majority and Justices Fairhurst and Alexander and Chief Justice Madsen dissenting), superseded, 172 Wash.2d 506, 259 P.3d 1079 (2011). Thus, these cases bear little similarity to the present case. With respect to the remaining three cases, two were issued by the same court , only days apart; see University of Michigan Regents v. Titan Ins. Co. , 484 Mich. 852, 769 N.W.2d 646 (2009) (issued July 31, 2009), and United States Fidelity Ins. & Guaranty Co. v. Michigan Catastrophic Claims Assn. , 484 Mich. 1, 795 N.W.2d 101 (2009) (issued July 21, 2009); and all three cases were split decisions, with the dissenting justices making forceful and persuasive arguments as to why reconsideration was *129 inappropriate under the circumstances that are present here. See University of Michigan Regents v. Titan Ins. Co. , supra, at 854, 769 N.W.2d 646 (Young, J., with whom Corrigan, J., joined, dissenting) ("[The] [p]laintiffs have not raised any new legal arguments in their motion for reconsideration.... [The] [p]laintiffs have cited nothing more than their disagreement with prior courts' application of the plain language of the relevant statutes, plain language which could not mislead either the parties or this [c]ourt. There is one significant change since our November 26, 2008 [decision]: the composition of this [c]ourt. Justice Hathaway unseated former Chief Justice Taylor in the 2008 election and took office on January 1, 2008, thereby shifting the philosophical balance on the [c]ourt. There is no palpable error, but there is a new philosophical majority." [Emphasis in original.] ); United States Fidelity Ins. & Guaranty Co. v. Michigan Catastrophic Claims Assn. , supra, at 27, 795 N.W.2d 101 ("The facts have not changed. The text of the statute at issue has not changed. The parties' **230 arguments have not changed. And the rationale advanced in the opinions of this [c]ourt has not changed. Yet, within a matter of months, a decision of this [c]ourt, thoughtfully briefed, argued, and considered by seven justices, is no longer worth the paper it was written on. Even the casual observer, however, does not really need to ask why. The reason is obvious: On January 1, 2009, the composition of this [c]ourt changed."); id., at 29, 795 N.W.2d 101 (majority overruled "[long-standing] and clear principle" that "a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur" [internal quotation marks omitted); Johnson v. Administrator, Ohio Bureau of Employment Services , 48 Ohio St. 3d 67, 71, 549 N.E.2d 153 (1990) (Holmes, J., with whom Moyer, C. J., joined, dissenting) (dissenting from decision to reconsider and reverse prior decision because "[t]he only change in circumstances in this case was the composition of the court"). Thus, to put it mildly, the persuasive value of these decisions is less than compelling.
Moreover, the very limited purpose of a motion for reconsideration is to "demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts." (Internal quotation marks omitted.) Chapman Lumber, Inc. v. Tager , 288 Conn. 69, 94 n.28, 952 A.2d 1 (2008) ; see also E. Prescott, Connecticut Appellate Practice & Procedure (5th Ed. 2016) § 8-5:9.2, p. 496 ("[T]he purpose of [a motion for] reconsideration is generally to point out errors or omissions in the original decision so that they may be corrected. Good grounds for reconsideration would seem to include: [1] over-looking a controlling statute or case; [2] new authority decisive of the appeal; [3] lack of subject matter jurisdiction; and [4] failure to join an indispensable party."
**231 [Footnotes omitted.] ). "[A ] motion to reargue [however ] is not to be used as an opportunity to have a second bite of the apple. " (Emphasis in original; internal quotation marks omitted.) Chapman Lumber, Inc. v. Tager , supra, at 94 n.28, 952 A.2d 1. I recognize that the motion at issue in Chapman Lumber, Inc. , was not a motion for reconsideration of an appellate decision, but a motion to the trial court to open a judgment. I can see no reason, however, why a different principle should apply here. If a motion for reconsideration may not be used to obtain a second bite at the same apple, a fortiori, it should not be *130 used to obtain a second bite at a different apple.
In reaching this conclusion, I am mindful that this case does not implicate the doctrine of stare decisis, which comes into play when a party has requested the court to overrule an earlier decision of the court. It is arguable, however, that the principles underlying that doctrine-saving resources, promoting judicial efficiency and promoting the perception that the decisions of this court are stable and based in the law, and not in the personal inclinations of judges-have even greater force in the present circumstances than when this court is asked to overrule an earlier decision. See State v. Peeler , 321 Conn. 375, 416-17, 140 A.3d 811 (2016) (Robinson, J. , concurring) ("Stare decisis is a formidable obstacle to any court seeking to change its own law.... It is the most important application of a theory of [decision-making] consistency in our legal culture and it is an obvious manifestation of the notion that [decision-making] consistency itself has normative value.... Stare decisis does more than merely push courts in hard cases, where they are not convinced about what justice requires, toward decisions that conform with decisions made by previous courts.... The doctrine is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception **232 that the law is relatively unchanging, it saves resources and it promotes judicial efficiency." [Internal quotation marks omitted.] ); see also id., at 419, 140 A.3d 811 (Robinson, J. , concurring) ("a change in the personnel of the court affords no ground for reopening a question which has been authoritatively settled" [internal quotation marks omitted] ); id., at 379, 140 A.3d 811 (Rogers, C. J. , concurring) ("When neither the factual underpinnings of the prior decision nor the law has changed, the [c]ourt could not pretend to be reexamining the prior law with any justification beyond a present doctrinal disposition to come out differently from [the prior decision]. To overrule prior law for no other reason than that would run counter to the view repeated in our cases, that a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided." [Internal quotation marks omitted.] ); id., at 381, 140 A.3d 811 (Rogers, C.J. , concurring) ("[a] change in the constituency of this court is not a sufficiently compelling reason to warrant departure from a [recent decision]" [internal quotation marks omitted] ).
Unlike the situation in which stare decisis is implicated, there is no risk in the present case of either depriving the parties of the opportunity to obtain a decision of a majority of the court that was in existence when the appeal was filed or of depriving Justice D'Auria of an opportunity to weigh in on an issue that was raised in an appeal filed during his tenure. The parties have obtained such a decision, and Justice D'Auria cannot have had any reasonable expectation that he should be able to weigh in on an issue that was raised in an appeal that was already decided at the time that he became a justice. Accordingly, it is perfectly clear to me that, under the specific circumstances of this case, where the petitioner has not claimed that there was any clear error or omission in the original en banc decision, there are six justices remaining from **233 the en banc panel that decided the appeal and the justices are evenly divided as to whether the original decision should be affirmed or reversed, the petitioner is not entitled to a second bite at a newly constituted apple and the original decision should stand. See General Statutes § 51-209 ("[n]o ruling, judgment or decree of any court may be reversed, affirmed, sustained, modified or in any other manner affected by the Supreme Court *131 or the Appellate Court unless a majority of the judges on the panel hearing the cause concur in the decision").
It is also clear to me that, when the petitioner's motion for reconsideration was ready to be heard by the court on January 17, 2017, it should have been placed on the conference agenda and acted on expeditiously, allowing a reasonable period of time, in the range of two to three weeks, for the justices to consider the parties' arguments, as is normally done. I would note that, between November, 2015 and April, 2017, not including this case and two other cases for which exceptional circumstances existed, the average period of time between the date that a motion for reconsideration was ready to be heard and the date that it was disposed of was approximately twenty-two days. In fact, the petitioner in Taylor v. Commissioner of Correction , 324 Conn. 631, 153 A.3d 1264 (2017), filed a motion for reconsideration on February 24, 2017, that became ready to be heard when the respondent filed an opposition on February 28, 2017, and the motion was placed on the conference agenda for that very same day , despite the fact that the appeal in that case was heard by a panel of six and the petitioner requested reconsideration en banc.[3]
Needless to say, that was not done in the present case. Instead, although the motion for reconsideration **234 was placed on the conference agenda shortly after it became ready, it was immediately marked over and consideration of the motion was delayed for months. During that period of delay, on March 8, 2017, Justice D'Auria was sworn in as a justice of this court. Thereafter, a majority of the six members remaining from the original panel in this case voted that Justice D'Auria should be added to the panel, thereby effectively voting that a motion for reconsideration may be used as a vehicle for judge shopping. This vote also ensured that a decision on the merits of the motion would be further delayed while Justice D'Auria familiarized himself with the case. Ultimately, there was no vote on the merits of the motion for reconsideration until May, 2018, more than 460 days after the motion for reconsideration was ready.
To my knowledge, this delay is the longest delay in ruling on a ready motion for reconsideration that has ever existed at this court. Indeed, this court took longer to rule on the motion for reconsideration than it did to issue its original decision in this case. See Skakel v. Commissioner of Correction , supra, 325 Conn. at 426, 429, 159 A.3d 109 (case was argued on February 24, 2016, and decision was released on December 30, 2016). Moreover, with the exception of Santiago II , supra, 318 Conn. at 1, 122 A.3d 1, this court has never, to my knowledge, added a new judge or justice to a reconsideration panel when the original appeal was heard by an en banc court. Santiago II was exceptional, however, because, while the original appeal in that case was pending before an en banc panel consisting of Chief Justice Rogers and Justices Norcott, Zarella, McLachlan, Eveleigh, Harper and Vertefeuille, the defendant moved for permission to file a supplemental brief and for additional oral argument addressing the effect on his appeal of Public Acts 2012, No. 12-5 (P.A. 12-5), which prospectively repealed the death penalty for crimes, effective on the date of passage.
**235 See State v. Santiago , 305 Conn. 101, 307 n.167, 49 A.3d 566 (2012) ( Santiago I ), superseded in part by Santiago II , 318 Conn. 1, 122 A.3d 1 (2105).
*132 This court denied the motion, concluding that the issues raised by the defendant, which had not been previously raised on appeal, would be more appropriately addressed in the context of postjudgment motions. See id., at 308 n.167, 49 A.3d 566. After the decision in Santiago I was released, the defendant filed a motion for "reconsideration," seeking review of the issues involving P.A. 12-5. By that time, Justice Harper had retired and Justice McLachlan had left the court for private practice. Justice McDonald and I had joined the court. In addition, Justice Palmer, who had been disqualified in Santiago I , was not disqualified from considering the issue raised in Santiago II. Ultimately, Justice Palmer, Justice McDonald and I replaced Justice Harper, Justice McLachlan and Justice Vertefeuille, who had taken senior status before Santiago I was heard. Thus, the defendant's motion for "reconsideration" was heard by a panel consisting of Chief Justice Rogers and Justices Norcott, Palmer, Zarella, Eveleigh, McDonald and me. As I have indicated, however, the issue raised in that motion was entirely new and, therefore, the defendant was actually seeking consideration of the issue for the first time, not "reconsideration." Moreover, the court had expressly directed the defendant to raise the claim in a postjudgment motion, and the defendant had not requested a new panel. Accordingly, unlike in the present case, the defendant in Santiago II was not judge shopping, and resolution of the new issue by a new panel created no risk of inconsistent decisions based solely on the composition of the reviewing panel.
In my view, there can be only one explanation for this calculated strategy to delay the resolution of the petitioner's motion for reconsideration until Justice D'Auria could be added to the panel, contrary to the court's **236 ordinary practice of deciding such motions when they are ready: the majority's belief that the petitioner is entitled to special treatment . There are thousands of convicted criminals languishing in Connecticut's prisons, approximately two-thirds of whom are either African-American or Hispanic, who would undoubtedly be thrilled to receive such special treatment. See Justice Center, Council of State Governments, "In Brief: Examining the Changing Racial Composition of Three States' Prison Populations," (March 2015), p. 4, available at https://csgjusticecenter.org/wpcontent/uploads/2015/03/ExaminingtheChangingRacialCompositionofThreeStatesPrisonPopulations.pdf (last visited April 30, 2018). Unfortunately for them, the vast majority do not share the petitioner's financial resources, social standing, ethnicity or connections to a political dynasty. Nor do their cases share the same "glam" and celebrity factor as this cause célèbre, which over the course of decades has spawned dozens, if not hundreds or even thousands, of books, television programs, and newspaper and magazine articles. Indeed, this court has begun to develop a boutique practice of giving special treatment to convicted criminals in such cases. See, e.g., Lapointe v. Commissioner of Correction , supra, 316 Conn. at 225, 112 A.3d 1. In my view, the primary effect of decisions like the majority decision in the present case and in Lapointe will be to erode public confidence and trust that the courts will treat all parties equally and to undermine the rule of law.
With respect to the merits of the petitioner's motion for reconsideration, as I have indicated, I agree with Justice Eveleigh's dissenting opinion in which he explains in detail the flaws in the majority's analysis and the extent to which the majority has ignored, distorted and misrepresented the evidence in this case in order to reach its desired result. I would offer the following sampling of evidence that the *133 majority downplays **237 or ignores outright in its zeal to reverse the petitioner's conviction:
(1) all of the prosecutor's repeated statements that the state maintained that the petitioner had only a partial alibi;
(2) defense counsel's repeated acknowledgment that the state believed that the petitioner had only a partial alibi;
(3) the testimony of Thomas Keegan, a captain in the Greenwich Police Department, that, according to the chief medical examiner who had performed the autopsy on Martha, the time window for her death was too broad to be helpful in investigating the crime;
(4) the testimony of H. Wayne Carver II, the state's chief medical examiner at the time of trial, that makes it clear that there was no forensic support for the conclusion that Martha was killed before 10 p.m.;
(5) the testimony of Joseph Alexander Jachimczyk, a forensic pathologist and medical examiner who testified as an expert for the petitioner, that would support the conclusion only that Martha was murdered sometime prior to dawn on October 31, 1975, and that 10 p.m. on October 30, 1975, was the earliest time at which she could have died;
(6) Dorothy Moxley's testimony that Martha had no set curfew of 9:30 p.m., even when she had to go to school the next day, and any informal curfew would have been at least one hour later than that on the night of the murder;
(7) Martha's diary, showing that she occasionally returned home late or went out again after returning home;
**238 (8) evidence showing that the barking of Helen Ix's dog, Zock, could well have been in response to "mischief night" activities such as the egging of cars, the setting off of fireworks and the discharging of homemade ballistics, and not in response to the attack on Martha;
(9) Andrew Pugh's testimony that the petitioner had a crush on Martha, that the petitioner was agitated the day after the murder and that he had admitted masturbating in the tree under which Martha's body was discovered on the night of the murder ; and
(10) Andrea Shakespeare's testimony that, as she arrived home from school on the day after the murder, the petitioner approached her car and informed her that Martha had been killed and that the petitioner and Thomas Skakel were the last persons to see her alive.
Most significantly, the majority simply dismisses the evidence showing that the petitioner confessed to the murder on multiple occasions over the course of decades and that he repeatedly changed his account of his activities on the night of the murder.
Moreover, as Justice Eveleigh also points out, in addition to downplaying and ignoring any evidence that does not support its desired outcome, the majority actually invents evidence to support its theory that the jury would not have convicted the petitioner if Ossorio had testified. Specifically, the majority contends that there is evidence compelling the conclusion that 9:30 p.m. on October 30, 1975, was "the last time any of the victim's friends reported seeing her"; part I of the majority opinion; when there was no such evidence before the jury.
The majority also cites other evidence that either was not before the jury or that is completely outside the record. Specifically, the majority cites evidence that:
**239 (1) Thomas Skakel engaged in sexual activities with the victim that night; see footnote 3 of the majority opinion;
*134 (2) a third dog was behaving oddly; see footnote 4 of the majority opinion;
(3) the victim likely died between 9:30 and 10 p.m. because none of the hundreds of people who were interviewed by the state police reported seeing her after that time; see part VI A of the majority opinion; and
(4) the testimony of John Simpson at the hearing on the petitioner's new trial petition contradicted testimony by a key witness for the state. See footnote 26 of the majority opinion.
Although the majority denies relying on this evidence, it is clear that the only reason that the majority refers to it is to bolster its conclusion that, if the case had been tried differently, there is a reasonable probability that the petitioner would not have been convicted.
It is essential to remember, however, that, in determining whether Sherman's failure to locate Ossorio and call him as a witness is sufficient to "undermine our confidence in the outcome"; Strickland v. Washington , 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984) ; the role of this court is not to speculate as to what would have happened if the petitioner's case had been tried in the manner that the members of the majority-none of whom has ever tried a murder case or presided over a murder trial-thinks that it should have been tried . Nor should the court evaluate the credibility of evidence presented at the criminal trial that was unaffected by the alleged deficient performance, which the jury is presumed to have found credible. The only question before this court is whether, in light of the evidence that was actually presented to the jury **240 and the arguments that were actually made to the jury, it is reasonably probable that there would have been a different outcome if not for the deficient performance. As Justice Eveleigh has made perfectly clear, there is no such reasonable probability in the present case because, first, the jury reasonably could have found that the murder did not occur while the Skakel brothers were at the Terrien residence and, therefore, that the petitioner had only a partial alibi. Second, even if the jury found that the murder did take place during that time, it is not reasonably probable that Ossorio's testimony would have convinced the jury that the petitioner was at the Terrien home in light of the evidence that the petitioner confessed on at least three separate occasions that he committed the murder -evidence that, as I have indicated, the majority completely dismisses, even though it was unaffected by Ossorio's testimony at the habeas trial and was presumptively credited by the jury.
Indeed, although the majority now concludes that the petitioner's confessions to Gregory Coleman and John Higgins must be disregarded because "the treatment that the petitioner received at [the] Elan [School] as an adolescent was so brutal and coercive, and so directly related to his alleged involvement in [Martha's] murder, that the jury reasonably would question how that treatment affected the way the petitioner thought about the murder and how he responded to questions about it"; part V B 2 of the majority opinion; the author of the majority opinion previously has taken the position that "there was nothing inherently coercive about the particular circumstances surrounding the statements to indicate that they had not been given freely. In fact, in the case of each such statement, the defendant appears to have been confiding, voluntarily, in a fellow Elan resident. On appeal, we cannot assume that the atmosphere at Elan was so coercive that any incriminating **241 statement by the defendant necessarily was the product of that coercive environment." (Emphasis added.) *135 State v. Skakel , 276 Conn. 633, 723, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S.Ct. 578, 166 L.Ed. 2d 428 (2006). Yet the majority now makes that very assumption. Apparently, in the majority's view, the petitioner's conviction could be upheld only if there were multiple confessions, plus eyewitnesses to the murder, plus DNA evidence, plus incriminating testimony by priests and other members of the clergy. Perhaps even that evidence would not suffice for the majority.
I would also emphasize that the majority's conclusion that no reasonable attorney would have failed to notice or follow up on the portion of the grand jury transcript in which Dowdle testified that she believed that she had heard her brother at the Terrien residence on the night of the murder, but was not sure that she saw him because she was in her mother's library with her "beau" and did not "venture out," is simply belied by the history of this case. The defendant's criminal trial, at which he was represented by Sherman, took place in 2002. Sherman, who had practiced criminal law for more than thirty years, both as a defense attorney and as a prosecutor, enlisted the help of at least three associate attorneys and consulted with, "among others, F. Lee Bailey, William F. Dow III, Richard Emanuel, David S. Golub, David T. Grudberg, and Barry Scheck." Skakel v. Commissioner of Correction , supra, 325 Conn. at 436 and n.6, 159 A.3d 109. None of these attorneys identified Dowdle's "beau" as someone who should be located and interviewed.
After his conviction, the petitioner filed a direct appeal, which was heard by this court on January 14, 2005. See State v. Skakel , supra, 276 Conn. at 633, 888 A.2d 985. The petitioner was represented on appeal by several highly experienced criminal and appellate attorneys, namely, Hope C. Seeley (now Superior Court Judge Seeley), Hubert J. Santos, Steven D. Ecker (now Supreme Court **242 Justice Ecker), Patrick S. Bristol and Sandra L. Snaden. Those attorneys claimed that the petitioner's conviction should be reversed and that he was entitled to a new trial because: "(1) his case improperly was transferred from the docket for juvenile matters to the regular criminal docket of the Superior Court; (2) his prosecution was time barred by the five year statute of limitations for felonies that was in effect when [Martha] was murdered in 1975; (3) the state failed to disclose certain exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), thereby depriving him of his right to a fair trial; (4) the state's attorney engaged in pervasive misconduct during closing argument in violation of the [petitioner's] right to a fair trial; (5) the trial court improperly permitted the state to introduce into evidence the prior sworn testimony of a certain witness in violation of the [petitioner's] constitutionally protected right of confrontation; and (6) the trial court improperly permitted the state to present evidence of several incriminating statements that the [petitioner] made while a resident at a school for troubled adolescents in Maine." State v. Skakel , supra, 639-40, 888 A.2d 985. The petitioner's attorneys also challenged the propriety of several other evidentiary rulings of the trial court. Id., at 640, 888 A.2d 985. Despite what the majority characterizes as the obvious "importance of the petitioner's alibi defense, the significance of [Ossorio's] testimony to that defense, the ease with which Ossorio could have been located, and the gravity of the charges and potential punishment that the petitioner faced"; part V A of the majority opinion; all of which, according to the majority, should have been immediately apparent to any reasonably effective attorney who read the transcript of Dowdle's testimony before the grand jury regarding the *136 petitioner's alibi, the petitioner's appellate attorneys raised no claim that Sherman's performance had been deficient because he failed to properly investigate **243 the petitioner's alibi defense. This court rejected the petitioner's claims and affirmed the judgment of conviction. Id., at 770, 888 A.2d 985.
In 2005, while the petitioner's direct appeal was still pending, the petitioner filed a petition for a new trial. See Skakel v. State , Docket No. CV-05-4006524-S, 2007 WL 3380139 (Conn. Super. October 25, 2007). In that proceeding, he was again represented by the law firm of Santos & Seeley, PC. See id., at *1. The revised petition for a new trial originally consisted of nine counts. Id., at *2. By the time of trial, however, the petitioner raised only four claims, specifically, a claim of newly discovered evidence of third-party culpability involving Gitano Bryant, Adolph Hasbrouck and Burton Tinsley, a claim of newly discovered evidence directly contradicting the testimony of Gregory Coleman at the petitioner's criminal trial, a claim that the state had engaged in a pattern of nondisclosure of exculpatory information involving, among other things, a sketch, profile reports of Thomas Skakel and Kenneth Littleton and certain time lapse date, and a claim concerning a "secret pact and book deal between the state's lead inspector, Frank Garr, and author Leonard Levitt." Id. The petitioner also raised allegations concerning Garr's threatening conduct toward witnesses. Id. Again, despite the fact that the petitioner's attorneys had obviously scoured the entire record for any information that would be helpful to the petitioner in postconviction proceedings, they raised no claim that Sherman's failure to follow up on Dowdle's grand jury testimony and to determine whether the "beau" had seen the petitioner on the night of the murder was ineffective assistance of counsel. The trial court denied the petition for a new trial; id., at *24 ; and the petitioner appealed to this court. See Skakel v. State , 295 Conn. 447, 991 A.2d 414 (2010). A majority of this court affirmed the judgment of the trial court. Id., at 522, 991 A.2d 414.
**244 In 2007, the petitioner filed an application for a writ of habeas in the United States District Court for the District of Connecticut, and that court granted his motion to amend the petition to add seven additional claims to the five asserted in the original petition, for a total of twelve separate claims involving alleged constitutional violations and newly discovered evidence. See Skakel v. Murphy , Docket No. 3:07cv1625 (PCD), 2009 WL 2253175, *1 (D. Conn. July 27, 2009). Yet again, the petitioner did not raise any claim pertaining to Sherman's failure to follow up on Dowdle's reference to her "beau." The petitioner's attorneys in that proceeding were Santos, Seeley and Snaden, whose surname was then Kuwaye. The District Court granted the petitioner's motion to stay the habeas proceeding to permit him to exhaust any unexhausted claims in state court, and that proceeding is apparently still pending. Id., at *3.
It was not until 2010, after the petitioner's experienced and highly respected attorneys had been searching high and low for any reason to cast doubt on the validity of the petitioner's conviction for eight years , that the petitioner filed the present petition for a writ of habeas corpus claiming that Sherman's failure to follow up on Dowdle's passing reference to her "beau" in her grand jury testimony constituted deficient performance. Yet, the majority insists that, upon reading Dowdle's testimony, any reasonably competent criminal defense attorney would have immediately recognized the purported critical importance of that testimony, attempted to ascertain the identity of the beau and attempted *137 to interview him. If that were the case, it is inconceivable that the petitioner's attorneys-some of the most well-known and highly respected attorneys in the state, and even the country-would have failed to recognize the obvious and critical importance of the testimony for eight years. **245 The majority also states "it could hardly have been easier for Sherman to have ascertained that Ossorio had critical alibi testimony to offer, such that even the most rudimentary of inquiries would have led Sherman directly and immediately to Ossorio." See part V A of the majority opinion. The majority is apparently relying on the habeas court's finding that, if Sherman had asked Dowdle about the beau, "he would have discovered Ossorio and gleaned that Ossorio was prepared to testify that the petitioner was present at the Terrien home during the evening in question." The majority cites absolutely no evidence, however, that would support this finding. The fact that Ossorio lived in the area during the criminal trial and that he would have been available to testify does not mean that Dowdle was aware of his whereabouts and availability. For all we know, Dowdle might not even have remembered his name. In fact, when Sherman was asked at the habeas trial whether he had asked Dowdle whether anyone else was with her on the night of the murder, he stated that he assumed that he had, and we have no idea how the petitioner's attorneys were ultimately able to discover Ossorio's identity or what efforts they were required to make to track him down.
Finally, I would note that, although the majority now claims that Sherman should have recognized immediately that the testimony of an unbiased alibi witness would be critically important to the petitioner's defense, Justice Palmer has previously characterized the alibi evidence that the petitioner presented at trial as strong and the state's theory that the alibi defense was concocted by the petitioner's family as barely plausible . Specifically, in his dissenting opinion in Skakel v. Commissioner of Correction , supra, 325 Conn. at 611, 159 A.3d 109, Justice Palmer claimed that "Sherman could have argued to the jury that this scenario [regarding Thomas Skakel's guilt] required no more speculation-indeed, I would **246 argue that it required considerably less speculation-than the state's argument with respect to the petitioner, namely, that all of his alibi witnesses were lying ...." Similarly, in his dissenting opinion in Skakel v. State , supra, 295 Conn. at 687, 991 A.2d 414, Justice Palmer argued that:
(1) the new evidence on which the petitioner relied likely would result in an acquittal, "not only because the evidence adduced by the state against the petitioner at his criminal trial was not strong, but also because of the strength of the petitioner's alibi";
(2) "the state presented no credible evidence to support its theory of a cover-up"; id., at 688, 991 A.2d 414;
(3) "[a]lthough the state's attorney's argument concerning the allegedly concocted alibi was not so completely lacking in evidentiary support as to be improper, it is abundantly clear that his explanation concerning the manner in which the Skakel family allegedly manufactured the petitioner's alibi was extremely weak"; id., at 690, 991 A.2d 414 ;
(4) the state's theory that the alibi was concocted by the petitioner's family was "factually attenuated"; id. ;
(5) he was "fully persuaded ... that the evidence of a cover-up was sufficiently weak, and the strength of the petitioner's alibi sufficiently strong, that, if a jury were to reconsider the alibi evidence in the context *138 of credible evidence that one or more other persons had the means, motive and opportunity to commit the murder, that jury likely would find the petitioner not guilty of the victim's murder"; id., at 693-94, 991 A.2d 414 ;
(6) the state's conspiracy theory was weak because "Greenwich police officers testified that they were given unfettered access to the Skakel children, as well as their home and property, in the hours following the murder, and for several months thereafter, and that the family was fully cooperative"; id., at 693, 991 A.2d 414 ;
**247 (7) the "[e]vidence to support [the state's theory that the petitioner's alibi was concocted by his family] is essentially nonexistent"; id., at 694, 991 A.2d 414 ; and
(8) the petitioner's alibi defense "was challenged by the state on grounds that find only marginal support in the record." Id., at 695, 991 A.2d 414.
The majority does not explain why it should have been obvious to Sherman that it was critically important to track down every possible lead to support an alibi defense that, according to the author of the majority opinion, was already strong and to rebut a theory supported by evidence that, also according to that author, was so weak and speculative as to be "essentially nonexistent." Id., at 694, 991 A.2d 414.
The majority also fails to recognize that, if the jury rejected what, according to Justice Palmer, was already a strong alibi defense, the jury also might have been skeptical of Ossorio's claim that, more than twenty-five years after Martha's murder, he remembered watching television with the petitioner that night, but he never saw any need during that period to reveal that fact to anyone, even after the petitioner was charged, despite the enormous publicity that the murder, the ensuing investigation and the charges against the petitioner generated. I recognize that Sherman acknowledged at the habeas trial that, in retrospect , testimony from an alibi witness who was unrelated to the petitioner would have been helpful. The question that this court must answer, however, is whether, as viewed at the time , the petitioner received effective assistance of counsel. See Siemon v. Stoughton , 184 Conn. 547, 555, 440 A.2d 210 (1981) ("[t]he issue, therefore, is not what counsel should have done to constitute the proper representation of the defendant considering the case in retrospect, but rather, whether in the circumstances, as viewed at **248 the time, the defendant received effective assistance of counsel" [internal quotation marks omitted] ).
Let there be no mistake as to the answer to that question: the petitioner received a fair trial and the effective assistance of counsel to which he was constitutionally entitled. Because the majority's conclusion that he is entitled to a new trial is not based on the evidence or the law, an objective observer might conclude that it must be based on the majority's belief that wealthy, white, politically connected defendants, like the petitioner, are entitled to special treatment from the courts.[4] Or is it based *139 on the majority's desire to make a splashy statement in a high profile case? Perhaps the majority feels that, even if the petitioner killed Martha, he has been punished enough. After all, the petitioner served eleven years in prison, and, for a prisoner like him, that should be enough time. I would note, however, that in Connecticut the present maximum sentence for intentionally taking a life is life in prison (sixty years) with a mandatory minimum sentence of twenty-five years. See General Statutes §§ 53a-35a (2) and 53a-35b. Is it sympathy then? Admittedly, I really have no way of knowing, but the appearances speak loud and clear. I do know, however, that Martha, a lively and lovely fifteen year old girl with her entire life ahead of her, received no such sympathy at the hands of her **249 vicious and heartless killer, and no such knight on a white charger intervened on her behalf. And where is the sympathy for Martha's mother, who has waited for more than forty years to see justice done? Indeed, perhaps the petitioner is betting that, after the passage of so much time, and the attendant death of witnesses, the deterioration of memories and the disappearance of evidence, the state will never retry him. Because the petitioner has received the justice to which he is entitled, and because I believe that no one is entitled to receive special treatment from the courts, for any reason, I dissent.

As other opinions released today note, a majority of the remaining six members of the original panel voted to add a seventh judge to the panel deciding the motion for reconsideration.

The habeas court found specifically with respect to Ossorio's testimony: "To the court, Ossorio was a disinterested and credible witness with a clear recollection of seeing the petitioner at the Terrien home on the evening in question. He testified credibly that not only was he present in the home with Dowdle and that he saw the petitioner there, but that he lived in the area throughout the time of the trial and would have readily been available to testify if asked." (Emphasis added.) The habeas court found Ossorio to be a "powerful" and "credible" witness, notwithstanding how long it took to locate him to tell his story. The record in this case is rife with witnesses called by both parties who never came forward until many years after the murder, or whose recollections changed-sometimes markedly-over time.

At the habeas trial, after being reminded of Dowdle's grand jury testimony, in which she first mentioned the "beau," Sherman testified as follows in response questions from the petitioner's counsel:
"Q. Did you ever try to find out who the beau was?
"A. No, because [Dowdle ] clearly testified [before the grand jury ] that she didn't know who was there ....
"Q. Did you ever try to find out who the beau was?
"A. He-he-I had no reason to suspect that he, in fact, would be helpful in that he saw [the petitioner ] and the rest of the boys. " (Emphasis added.) Days later in the habeas trial, the respondent's counsel gave Sherman another opportunity to explain his rationale for not even asking Dowdle who had been with her that night, and the following exchange occurred:
"Q. From that passage [in the grand jury testimony], did that give you any indication to think that [Dowdle's] beau would have heard or seen anything that night?
"A. Well, she said that she didn't venture out and that her beau was in [her] mother's library.
"Q. Okay. And would that give you any indication that, even if he heard voices, he'd be able to identify them.
"A. Well, it's her beau. I don't know how close they were, but she couldn't identify her own cousins' voices or her brother's voice necessarily, so how would the beau be able to do anything-be able to do anything-be any more accurate, especially, if [it was ] only occasionally that he went out there. " (Emphasis added.)

As Justice Robinson expressed in his original concurring and dissenting opinion, "I cannot think of a single reasonable, strategic reason why Sherman would not at least attempt to track down Ossorio ...." Skakel v. Commissioner of Correction , 325 Conn. 426, 533, 159 A.3d 109 (2016) (Robinson, J. , concurring in part and dissenting in part).

This reading of the record is consistent with the testimony of Jason Throne, Sherman's cocounsel, called to testify by the respondent at the habeas trial. Throne did not suggest that the defense team made a decision that the "beau" would not be helpful, or even that the "beau" was the topic of discussion. Rather, when asked by the petitioner's counsel, "[w]as there any discussion among the defense team to try and find out who this beau was?" Throne replied: "I don't recall any specific discussions about her beau; I just don't recall, I don't remember."

The following colloquy between Benedict and Dowdle took place during the criminal trial:
"Q. Isn't it true that you and [your brother] James were never in the same room [on the night of the murder]?
"A. I don't remember.
"Q. Do you remember, you have indicated that you were with your husband?
"A. No, I didn't.
"Q. You were with somebody?
"A. A friend of mine.
"Q. I wouldn't suggest you misspoke, I misheard. You were with someone? "A. A friend of mine.
"Q. A friend. And where were you-where in the house were you when [James and the Skakels] entered?
"A. I was in the library."

In fact, at this time during the criminal trial, the court also allowed a transcript of the relevant portion of Dowdle's grand jury testimony into evidence as a full exhibit. While Sherman was present, Benedict read that portion of the transcript into the record, beginning with Dowdle's testimony that she "was in [the library] with [her] beau at the time ...."

It is undisputed that the deficient performance alleged to have occurred in the present case was not among the limited class of errors for which prejudice may be presumed. See Strickland v. Washington , supra, 466 U.S. at 692, 104 S.Ct. 2052.

Of course, the Connecticut constitution may, in theory, afford broader protections with respect to the right to counsel than does the sixth amendment to the United States constitution. Neither the petitioner nor the majority argues, however, that the state constitution confers broader protection under the circumstances presented in this appeal.

The jury was fully aware that the time of the offense was not an essential element of the charged crime and that the state was under no obligation to narrow the time of the commission of the offense more than the available evidence warranted. Indeed, the trial court charged the jury to that effect on two separate occasions.

The basic principle here is that several different things would have to happen for the petitioner to prevail, and he has the burden of proving that it is reasonably likely that all of them, collectively, would happen. For there to be nearly even odds that three different things will happen, it must be overwhelmingly likely that each will. For example, one would not place a wager that Boston teams will win the Super Bowl, the World Series, and the National Basketball Association Championship in a given year unless the New England Patriots, the Boston Red Sox, and the Boston Celtics were each prohibitive favorites. If each team was just a slight favorite, wagering on all three winning would be a sucker's bet.