[No. 80653-5.   En Banc.]

Argued May 3, 2011.      Decided September 1, 2011.

THE STATE OF WASHINGTON, *Respondent*, v. LORETTA LYNN ERIKSEN, *Petitioner*.

*William J. Johnston*, for petitioner.

*David S. McEachran, Prosecuting Attorney*, and *Ann L. Stodola, Deputy*, for respondent.

*Mary M. Neil* on behalf of Lummi Nation, amicus curiae.

¶1 FAIRHURST, J. — We granted reconsideration to again consider whether a tribal police officer who observed Loretta Lynn Eriksen commit a traffic infraction on the Lummi Reservation could validly stop her outside the reservation and detain her until county police arrived. We conclude that the tribe's inherent sovereign powers did not authorize this extraterritorial stop and detention.

## I. FACTUAL HISTORY

¶2 At approximately 1:30 a.m. on August 10, 2005, Officer Mike McSwain of the Lummi Nation Police Department was driving east on Slater Road within the Lummi Reservation[1] when he saw a vehicle approaching him with its high beams activated. McSwain flashed his high beams

---

[1] In the courts below, Eriksen tried to establish that the entire incident occurred outside the Lummi Reservation. The district court held that at least part of the initial incident took place on the reservation, and the superior court affirmed. In this court, Eriksen describes the initial traffic infraction as occurring on the reservation. *E.g.*, Pet. for Review at 3. She also does not assign error to the lower courts' determinations that the incident began within the reservation. We accept unchallenged findings of fact as verities on appeal. *State v. Hill*, 123 Wn.2d 641,

to alert the approaching vehicle that its high beams were on, but the vehicle did not dim its lights in response. McSwain slowed down and prepared to turn around so that he could stop the vehicle for failure to dim its lights.[2] At that point, the approaching vehicle drifted across the center line, "coming within a couple of feet" of McSwain's patrol car. Clerk's Papers (CP) at 23. McSwain came to a stop and prepared to swerve if necessary, but the vehicle drifted back into the westbound lane of travel. McSwain then observed a second vehicle following closely behind the drifting vehicle. He turned around, activated his overhead lights, and followed the two westbound vehicles.

¶3 Both vehicles stopped at a gas station located off the Lummi Reservation. The second vehicle broke off and drove behind a building, out of sight, while the first vehicle stopped where McSwain could see it. McSwain observed a passenger jump out of the vehicle and run around the front, while the driver moved into the passenger seat. McSwain ordered the driver and passenger to stop moving and then called for a backup officer.

¶4 When a backup officer arrived, McSwain approached the driver, whom he later identified as Eriksen. He asked her why she had moved into the passenger seat. She responded that she had not been driving. McSwain observed that Eriksen smelled strongly of intoxicants, had bloodshot and watery eyes, and spoke in slightly slurred speech. McSwain determined that Eriksen was not a tribal member, then called for a Whatcom County deputy sheriff.

¶5 While waiting for the deputy to arrive, McSwain asked Eriksen to step out of the car. She had difficulty keeping her balance and walking, and she swayed back and forth when asked to stop and face him. Without being asked, Eriksen told McSwain she would not do any sobriety

---

644, 870 P.2d 313 (1994). Therefore, we assume the incident began on the reservation.

[2] The Lummi Nation Code of Laws 6.04.050(a) requires drivers to use low beams within 500 feet of oncoming vehicles.

tests. McSwain did not request or perform any. Instead, he detained Eriksen and put her in the back of his patrol car until the Whatcom County deputy sheriff arrived. The deputy arrested Eriksen.

## II. PROCEDURAL HISTORY

¶6 Eriksen was charged with driving under the influence (DUI) in the Whatcom County District Court. She moved to suppress[3] on the basis that McSwain did not have the authority to stop and detain her off the reservation. The district court denied the motion and Eriksen was convicted as charged. On appeal, the Whatcom County Superior Court upheld the conviction. We granted review of the superior court's decision.

¶7 In 2009, we affirmed Eriksen's conviction. Eriksen moved for reconsideration, and the State joined the motion with regard to our statutory analysis. We granted reconsideration and withdrew our opinion. In 2010, the court again affirmed Eriksen's conviction, and she moved to reconsider a second time. We granted reconsideration and withdrew the second opinion.

## III. ANALYSIS

██ ¶8 As a general rule, "a valid arrest may not be made outside the territorial jurisdiction of the arresting authority." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 9.07, at 763 (2005) (citing WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 1.3(e) n.2 (3d ed. 2000)). This principle of territorial jurisdiction has long been accepted in Washington State. *See, e.g., State v. Barker*, 143 Wn.2d 915, 920-21, 25 P.3d 423 (2001); *City of Wenatchee v. Durham*, 43 Wn. App. 547, 549-50, 718 P.2d 819 (1986); *Irwin v. Dep't of Motor Vehicles*, 10 Wn. App. 369, 371, 517 P.2d 619 (1974).

---

[3] The district court characterized the proceeding as a "[m]otion to [d]ismiss for lack of jurisdiction." CP at 17. The State now characterizes the proceeding as a "motion to suppress/dismiss the case for lack of jurisdiction." Resp't's Br. at 3.

¶9 *Barker* illustrates how law enforcement officers may be limited by territorial jurisdiction. In *Barker,* an Oregon police officer observed a driver speeding, making unsafe lane changes, and following too closely in Oregon near the Washington State border. 143 Wn.2d at 918. The officer pursued the driver into Washington, where the officer stopped and detained the driver until Washington police arrived and arrested him for DUI. *Id.* We held that the stop and detention were " 'without authority of law' " under article I, section 7 of the Washington State Constitution[4] because the Oregon officer was not authorized by statute or common law to act outside her jurisdiction. *Barker,* 143 Wn.2d at 922 (quoting CONST. art. I, § 7). The exclusionary rule required suppression of the fruits of the unlawful stop and detention. *Id.*

¶10 Here, although McSwain's stop and detention of Eriksen took place outside the Lummi Nation's territorial jurisdiction, the State argues the stop and detention were justified by the tribe's inherent sovereign authority. Indian tribes possess a "unique and limited" sovereignty that exists unless withdrawn by treaty, by statute, or as a necessary result of the tribes' dependence on the United States. *United States v. Wheeler,* 435 U.S. 313, 323, 98 S. Ct. 1079, 55 L. Ed. 2d 303 (1978). Indian tribes retain the inherent sovereign power to promulgate criminal laws and enforce them against tribal members. *Id.* at 322; *see also Strate v. A-1 Contractors,* 520 U.S. 438, 459, 117 S. Ct. 1404, 137 L. Ed. 2d 661 (1997). Tribes also retain the right to create a traffic code and enforce it on the reservation against tribal members. *See Confederated Tribes of Colville Reservation v. Washington,* 938 F.2d 146 (9th Cir. 1991).

¶11 In *State v. Schmuck,* 121 Wn.2d 373, 850 P.2d 1332 (1993), we held that a tribe's inherent authority allowed a tribal officer to stop a non-Indian driver on a public road within the reservation and detain him until state officers

---

[4] Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

arrived. We reasoned that the tribe's inherent authority included the ability to stop the driver because

> [o]nly by stopping the vehicle could [the tribal officer] determine whether the driver was a tribal member, subject to the jurisdiction of the Tribe's traffic code. The alternative would put tribal officers in the impossible position of being unable to stop any driver for fear they would make an unlawful stop of a non-Indian. Such a result would seriously undercut the Tribe's ability to enforce tribal law and would render the traffic code virtually meaningless. It would also run contrary to the "well-established federal policy of furthering Indian self-government."

*Id.* at 383 (internal quotation marks omitted) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978)). The ability to detain was supported in large part by a treaty provision requiring the tribe to deliver " 'offenders against the laws of the United States' " to the authorities for trial and the tribe's traditional authority to exclude unwanted persons from tribal land. *Id.* at 383-90 (quoting Treaty between the United States and the Dwámish, Suguámish, and Other Allied and Subordinate Tribes of Indians in Washington Territory, art. IX, Jan. 22, 1855, 12 Stat. 927, 929 (hereinafter Treaty of Point Elliott)).

¶12  In *Settler v. Lameer*, 507 F.2d 231 (9th Cir. 1974), the Ninth Circuit held that a tribe retained the inherent authority to arrest tribal members at usual and accustomed fishing sites outside the reservation for violation of tribal fishing regulations. A treaty explicitly secured to the tribe " 'the right of taking fish at all usual and accustomed places, in common with citizens of the Territory.' " *Id.* at 232 (quoting Treaty with the Yakama Nation, art. III, June 9, 1855, 12 Stat. 951, 953). The Ninth Circuit reasoned that the tribe's explicit treaty power to regulate fishing contained the right to arrest tribal members at usual and accustomed fishing sites for violating the regulations because "[t]he power to regulate is only meaningful when combined with the power to enforce." *Id.* at 238.

¶13 The State argues that *Schmuck* establishes the Lummi Nation's inherent sovereign power to stop and detain offenders on the reservation, while *Settler* shows that this enforcement power may extend beyond reservation boundaries. We disagree.

¶14 The inherent sovereign power identified in *Schmuck* does not logically extend beyond reservation boundaries. The State is correct that preventing tribal police from stopping and detaining drivers off the reservation would "undercut the Tribe's ability to enforce tribal law" by encouraging drivers to race for the reservation border and escape detention. *Schmuck*, 121 Wn.2d at 383. While this is troubling on a policy level, the concept of territorial jurisdiction necessarily limits any sovereign's ability to fully enforce its laws. For example, Oregon's ability to enforce its traffic code was undercut when we held that an Oregon officer could not stop and detain an offender who crossed the state border. *Barker*, 143 Wn.2d 915. That impediment to enforcement alone did not mean that Oregon's sovereignty was compromised. Rather, the limitation on Oregon's authority to enforce its laws flowed necessarily from Oregon's own geographic boundaries.

¶15 While *Settler* did allow for certain off-reservation arrests, it does not justify a tribal officer's traffic stop on ordinary state land. The *Settler* court noted that

> [o]ur holding that the Yakima Indian Nation may enforce its fishing regulations by making arrests and seizures off the reservation is a very narrow one. Off-reservation enforcement is limited strictly to violations of tribal fishing regulations. The arrest and seizure of fishing gear must be made at "usual and accustomed places" of fishing.

507 F.2d at 240. Here, the stop and detention were made on ordinary state land, over which the Lummi had no special legal rights.

¶16 Moreover, *Settler* relied on an express treaty provision giving the tribe the right to regulate fishing at usual

and accustomed off-reservation fishing sites. *Id.* at 241. In contrast, the Treaty of Point Elliott, which created the Lummi Reservation, does not explicitly grant the tribe the right to regulate or enforce traffic laws beyond its borders.[5] The Treaty of Point Elliott does state that the "tribes agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Treaty of Point Elliott, art. IX, 12 Stat. 927, 929. We have said that this provision "appears to reflect a common concern of the federal government during treaty negotiations in the mid-1800's to prevent non-Indians from hiding out on reservations in the mistaken belief that they would be free from prosecution for their crimes." *Schmuck,* 121 Wn.2d at 385 (citing H.R. REP. No. 474, at 98 (1834)). While that concern was implicated in *Schmuck*, which dealt with the tribe's detention of offenders on the reservation, article IX bears no relation to detaining persons who leave the tribe's territorial jurisdiction and are fully subject to state prosecution. Eriksen was off the reservation when McSwain stopped her. Article IX is irrelevant.

¶17 The dissent cites the second exception of *Montana v. United States,* 450 U.S. 544, 566, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981), as a source of the tribe's inherent authority to stop and detain Eriksen. Dissent (Owens, J.) at 520, 522. *Montana* held that tribes retain the inherent authority to exercise civil regulatory authority over the conduct of non-Indians on fee lands within the reservation when the conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566. *Montana* delineated the scope of a tribe's civil regulatory jurisdiction within the reservation. The rules applicable in that context do not naturally extend to Eriksen's case, which involves the powers of tribal law

---

[5] Like the treaty in *Settler,* the Treaty of Point Elliot contains an explicit provision giving tribes "[t]he right of taking fish at usual and accustomed grounds and stations." Treaty of Point Elliott, art. V, 12 Stat. 927, 928. This provision is clearly not at issue here, where no fishing was involved.

enforcement officers outside the reservation. We conclude that the Lummi Nation did not have inherent authority to stop and detain Eriksen on ordinary state land outside the reservation, beyond the limits of the tribe's territorial jurisdiction.

¶18 The Lummi Nation stresses the limited nature of the power to stop and detain offenders off-reservation until State authorities arrive, describing this power as merely "assisting the State in asserting *its* regulatory and adjudicatory authority." Br. of Amicus Curiae Lummi Nation at 9. This characterization ignores the fact that Washington recently established certain training and liability requirements for tribal officers to become general authority Washington peace officers, with the power to arrest in fresh pursuit on Washington land. *See* RCW 10.92.010; RCW 10-.93.070(6), .120. Creating a doctrine of fresh pursuit based only on a tribe's inherent authority would effectively abrogate this statutory scheme, undermining Washington's sovereign authority to regulate arrests in the state. Certainly, Washington's sovereignty cannot extinguish the Lummi Nation's sovereign powers. Rather, we simply note that the unwarranted extension of the Lummi Nation's powers would not be an enhancement of Washington's sovereign rights but an impingement of them.

¶19 While the territorial limits on the Lummi Nation's sovereignty create serious policy problems, such as the incentive for intoxicated drivers to race for the reservation border, the solution does not lie in judicial distortion of the doctrine of inherent sovereignty. Instead, these issues must be addressed by use of political and legislative tools, such as cross-deputization or mutual aid pacts, to ensure that all law enforcement officers have adequate authority to protect citizens' health and safety in border areas. We urge the Lummi Nation and Whatcom County to work together to solve the problems made evident by this case; but if they

cannot or will not do so, we will not manipulate the law to achieve a desirable policy result.[6]

¶20 The State contends that even if the Lummi Nation's inherent sovereign authority did not justify McSwain's stop and detention of Eriksen, the doctrine of citizen's arrest does. In its oral decision, the superior court concluded that McSwain's detention of Eriksen was not a valid citizen's arrest. Verbatim Report of Proceedings at 2-3. The State did not seek cross review of this determination or mention the issue of citizen's arrest in its answer to Eriksen's motion for discretionary review. In *Barker*, we declined to reach the State's citizen's arrest argument when the State did not file an answer to the defendant's petition for review. 143 Wn.2d at 919-20. Similarly, we decline to reach the tardily raised citizen's arrest issue here.

## IV. CONCLUSION

¶21 The Lummi Nation's inherent sovereign powers do not include the authority to stop and detain outside the tribe's territorial jurisdiction for a traffic infraction. Accordingly, McSwain's stop and detention of Eriksen were in-

---

[6] The problematic policy implications of today's holding, while significant, are likely far narrower than the dissent implies. The dissent offers a hypothetical in which an arsonist flees across the reservation border and, while a police officer helplessly observes, sets a fire that threatens Indian land and lives. Dissent (Owens, J.) at 521. At common law, police officers could stop and arrest outside their territorial jurisdiction when in fresh pursuit of one who had committed a felony. *See, e.g., Barker*, 143 Wn.2d at 921. Arson is a felony. RCW 9A.48.020(2) (first degree arson is a class A felony), .030(2) (second degree arson is a class B felony). Assuming the continuing validity of the common law doctrine, the officer would be empowered to stop and arrest the arsonist in fresh pursuit.

Amicus Lummi Nation raised the doctrine of fresh pursuit as a source of McSwain's authority to stop and detain Eriksen. Br. of Amicus Curiae Lummi Nation at 12-20. The State has never advanced the doctrine of fresh pursuit in this case, and it concedes that Eriksen's stop and detention were not authorized under any Washington fresh pursuit statute. Resp't's Br. at 6-7. We need not address issues raised only by amici. *Accord State v. Gonzalez*, 110 Wn.2d 738, 752 n.2, 757 P.2d 925 (1988). We therefore decline to reach the fresh pursuit argument except to note that, unlike arson, Eriksen's DUI conviction was a misdemeanor. Former RCW 46.61.502(5) (1998) (DUI is a gross misdemeanor); LUMMI NATION CODE OF LAWS 6A.02.090(d), 6A.01.020(a)(2) (DUI is a class B offense subject to 30-90 days in jail and a fine of $250-$1,250).

valid. We reverse the superior court's decision and remand to the district court for proceedings consistent with this opinion.

MADSEN, C.J., and J.M. JOHNSON, STEPHENS, and WIGGINS, JJ., concur.

¶22 ALEXANDER, J. (dissenting) — I would affirm Loretta Eriksen's conviction on the basis that Tribal Officer Mike McSwain's brief detention of Eriksen at a location outside the boundaries of the Lummi Indian Reservation was a valid citizen's arrest.

¶23 It is well settled that under the common law an individual citizen can effect an arrest of a person who is committing a felony or a misdemeanor in the citizen's presence if the offense is a breach of the peace.[7] *State v. Malone*, 106 Wn.2d 607, 609 n.1, 724 P.2d 364 (1986) (citing *State v. Miller*, 103 Wn.2d 792, 698 P.2d 554 (1985); *State v. Gonzales*, 24 Wn. App. 437, 604 P.2d 168 (1979)). In my view, a peace officer should be able to exercise the same authority outside of that officer's jurisdiction, provided the officer does not exploit the color of his or her office in doing so. Indeed, in *Malone*, we indicated that a Kootenai County sheriff's deputy who had followed a speeding truck from Idaho into Washington State in a marked police car with lights and siren activated had authority to arrest the driver of the truck under a citizen's arrest theory.

¶24 The situation here is very similar to that in *Malone*, the record showing that Tribal Officer McSwain stopped and detained Eriksen slightly outside his jurisdiction after he observed her driving within the tribal jurisdiction in a manner that caused him reasonably to believe that she was driving while under the influence of intoxicants. Driving

---

[7] Pursuant to RCW 9A.04.060, provisions of the common law relating to the commission of crime are applicable where they are not repugnant to the state constitution or statutes.

under the influence (DUI) is a gross misdemeanor. RCW 46.61.502. I believe we should join courts in other jurisdictions in recognizing DUI as a breach of the peace. *E.g., Heck v. State*, 507 S.W.2d 737 (Tex. Crim. App. 1974); *State ex rel. State v. Gustke*, 205 W. Va. 72, 81, 516 S.E.2d 283 (1999). Such a ruling would be consistent with the *Restatement (Second) of Torts* § 116 (1965), which defines "breach of the peace" as "a public offense . . . causing or likely to cause an immediate disturbance of public order." Those who drive while under the influence characteristically do so in an erratic manner that carries with it the potential to cause serious injury or death to other drivers or pedestrians. Such conduct clearly disturbs public order.

¶25 Even though it is my view that Tribal Officer McSwain observed the commission of an offense that constitutes a breach of the peace, I must still confront the question of whether his actions are barred from qualifying as a citizen's arrest under the "color of office" doctrine. Under that doctrine a peace officer is prohibited from utilizing his official position to gather evidence. Even though Washington courts have not yet confronted this issue, I find the analysis of the Supreme Court of Appeals of West Virginia in the *Gustke* opinion persuasive. The court there said that an officer is barred by the doctrine only from "*collect[ing] evidence that a private citizen would be unable [to] gather.*" *Gustke*, 205 W. Va. at 81; *see also State v. Phoenix*, 428 So. 2d 262, 266 (Fla. Dist. Ct. App. 1982). In *Gustke*, a uniformed off-duty officer, who was outside his jurisdiction, was driving home from work when he observed a car being driven erratically and weaving on the road. After using his siren to stop the car, the officer detained the driver until an officer from the proper jurisdiction arrived. The *Gustke* court found that since the officer had not investigated beyond merely asking for the driver's identification, he did not violate the under color of office doctrine. Here, like the situation in *Gustke*, McSwain observed Eriksen's driving pattern before stopping her and he ceased

his investigation of the possible DUI after he checked Eriksen's identification and determined that she was not a tribal member and that her vehicle was outside the boundary of the Lummi Reservation. Any observations McSwain made about Eriksen's behavior after the stop and up to the time he checked her identification could have been made by a private citizen as easily as they were made by McSwain. Under these facts, the color of office doctrine should not serve as a bar to McSwain's authority to effect a valid citizen's arrest.

¶26 I would affirm Eriksen's conviction on the basis that McSwain's extraterritorial stop and detention of Eriksen was a valid citizen's arrest.

¶27 OWENS, J. (dissenting) — This case concerns an Indian tribe's authority to detain a non-Indian who threatens the health and welfare of a tribe and its members until state law enforcement officers arrive. The general power of a tribe to do so is well established. *See, e.g., State v. Schmuck*, 121 Wn.2d 373, 390-91, 850 P.2d 1332 (1993). The unique aspect of this case is that, in the process of pulling over the driver who threatened the tribe's health and welfare, the driver and tribal law enforcement officer crossed the reservation's border. Under my reading of applicable precedent, the tribe possesses authority to detain a non-Indian driver who violated the law while on the tribe's reservation and whose conduct continues to directly threaten the health or welfare of the tribe. *See Montana v. United States*, 450 U.S. 544, 566, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981); *Schmuck*, 121 Wn.2d at 391. The majority disagrees. Accordingly, I respectfully dissent.

### I. Facts

¶28 The facts set forth by the majority are accurate as far as they go, but several additional facts are relevant. Slater Road lies entirely within, and constitutes the north-

ern boundary of, the Lummi Reservation. While patrolling this area of the reservation in the early hours of August 10, 2005, Officer Mike McSwain of the Lummi Nation Police Department was driving east on Slater Road. After an oncoming car failed to dim its high-beam lights in response to Officer McSwain flashing his own high-beam lights, Officer McSwain prepared to make a U-turn and contact the driver of the vehicle. As he did so, the oncoming vehicle drifted across the center of the road and came within several feet of Officer McSwain's police car before drifting back into the appropriate westbound lane. At this point Officer McSwain discovered that a second vehicle was following the first. Officer McSwain then turned around, activated his car's overhead lights, and caught up to the vehicles as they approached the intersection of Slater Road and Elder Road. This intersection forms a "T"; Elder Road runs north from Slater Road, which continues both east and west from that point. On the northwest corner of the intersection is a gas station and minimarket. The two vehicles pulled off the road to the right (i.e., north) and into the gas station's parking lot, which is immediately adjacent to Slater Road. Officer McSwain pulled in behind the first vehicle while the second vehicle pulled around the side of the gas station out of Officer McSwain's view. Immediately thereafter, the driver of the first vehicle, Loretta Eriksen, moved from the driver's seat, over the center console, and into the passenger seat while the passenger attempted to run around the front of the car to the driver's seat. Officer McSwain ordered Eriksen and the passenger to put their hands on the dashboard and the hood, respectively, while he waited for additional units to respond.

¶29 After additional Lummi officers arrived and verified that the second vehicle had left the scene, Officer McSwain approached Eriksen. While talking to Eriksen, Officer McSwain smelled an odor of alcohol on her and observed that her eyes were bloodshot and watery, her speech was slurred, and she staggered as she walked. Upon discovering

that Eriksen was not a tribal member, Officer McSwain requested that Whatcom County send a deputy sheriff. In the meantime, Officer McSwain informed Eriksen that she would be detained until the deputy arrived.

*II. The Lummi Nation's Inherent Authority Justified Eriksen's Detention*

¶30 An Indian tribe possesses authority to stop vehicles that violate tribal laws while on the tribe's reservation. *Schmuck*, 121 Wn.2d at 380. This authority flows from the tribe's inherent "power to prescribe and enforce internal criminal and civil laws" and applies even where the driver of the vehicle stopped turns out to be a non-Indian. *Id.* If the driver does turn out to be a non-Indian, the tribe lacks jurisdiction to prosecute the driver, *see Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 212, 98 S. Ct. 1011, 55 L. Ed. 2d 209 (1978), but may detain the driver until "he or she can be turned over to state authorities," *Schmuck*, 121 Wn.2d at 392; *accord United States v. Terry*, 400 F.3d 575, 580 (8th Cir. 2005).

¶31 A tribe's power to detain a non-Indian derives from two sources. First, that power is a component of the tribe's inherent authority to exclude trespassers. *Schmuck*, 121 Wn.2d at 389-90 (quoting *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975)). Second, and more relevant to the present case, the power to detain is, in certain instances, a component of the tribe's inherent authority to regulate conduct of non-Indians that "threatens or has some direct effect on the . . . health or welfare of the tribe." *Montana*, 450 U.S. at 566. This is commonly referred to as the "second *Montana* exception." In *Schmuck*, this court recognized that drunk driving threatens a tribe's health and welfare and therefore held that tribal police officers had inherent authority to detain a person suspected of drunk driving until state authorities arrived. 121 Wn.2d at 391-92.

¶32 The majority suggests that the tribe's inherent authority to detain a non-Indian disappears the moment the

non-Indian crosses the boundary of the reservation, notwithstanding that a violation of the law took place on the reservation and notwithstanding the continuing existence of a threat to the tribe's health and welfare. The present case is illustrative. While on the Lummi Reservation, Eriksen came within several feet of colliding with Officer McSwain's car, which was already pulled to the side of the road in preparation for a U-turn. In response to Officer McSwain's activation of his car's overhead lights, Eriksen pulled into a gas station immediately adjacent to Slater Road. She did not leave the area. Had Officer McSwain been unable to detain her, nothing would have prevented Eriksen from simply returning to Slater Road (i.e., the reservation), at which point Officer McSwain could have again activated his overhead lights and begun the process anew. Though I understand the majority's desire for a bright-line rule, its proposed standard is untenable.

¶33 A hypothetical further illustrates the absurdity of the majority's proposed rule. Suppose a tribal law enforcement officer observes an arsonist attempting to set a fire in a wooded area of the reservation. The officer commands the would-be arsonist to "Stop in the name of the law!" The arsonist flees across the border of the reservation and immediately begins setting fire to the same forest, a fire that will inevitably and quickly spread to the reservation, sweeping through Indian homes and land. Must the tribal law enforcement officer stand on the reservation side of the boundary and fiddle with his radio while the reservation burns? According to the majority's interpretation of inherent tribal authority, it appears so.

¶34 The better rule is that, under the second *Montana* exception, where an individual (1) violates the law while on an Indian reservation and (2) continues to pose a direct and immediate threat to the health or welfare of the tribe, the tribe may stop and detain that individual, notwithstanding that he or she may have traveled beyond the reservation's border. The instances in which this rule will justify off-

reservation detention are apt to be few and far between. If an individual has crossed the reservation's border and is driving away from the reservation, the danger that individual poses to the tribe's health or welfare will generally be neither immediate nor direct. It will therefore not justify an off-reservation detention. Here, however, a dangerous and inebriated driver remained in her car immediately adjacent to the reservation. The tribe had inherent authority under the second *Montana* exception to detain Eriksen based on the direct and immediate threat she posed to the health and welfare of the tribe.[8]

¶35 The majority suggests that a contrary interpretation of the tribe's inherent power is necessary in order to avoid abrogating the State of Washington's statutory scheme governing fresh pursuit. While I disagree that allowing a tribe to detain persons threatening the health and welfare of the tribe abrogates the State's statutory scheme, this is, in the end, irrelevant. We should not be interpreting the tribe's inherent authority in the light of state statutes; to the contrary, we should be interpreting state statutes in light of a tribe's inherent authority. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."). Only Congress can deprive tribes of their sovereign authority. *Schmuck*, 121 Wn.2d at 393.

¶36 Ultimately, the majority's holding undermines our decision in *Schmuck*. Under the majority's rule, the Lummi Tribe is effectively unable to stop vehicles traveling west on

---

[8] The majority's implication that this approach is a "judicial distortion of the doctrine of inherent sovereignty," majority at 514, substantially misses the mark. *See, e.g.*, Frank Pommersheim, *At the Crossroads: A New and Unfortunate Paradigm of Tribal Sovereignty*, 55 S.D. L. REV. 48, 50 (2010). ("[T]he [United States Supreme] Court changed direction sharply and became increasingly inimical to tribal sovereignty, especially in regard to tribal authority over non-Indians.") The doctrine of inherent sovereignty, as interpreted by the United States Supreme Court, does not yet preclude tribes from protecting the health and welfare of their members by briefly detaining non-Indians in the circumstances present in this case.

Slater Road, no matter how great the danger they pose, because the moment the vehicles pull over to the right they will have crossed the border of the Lummi Reservation. I do not find this absurd result to be compelled by federal or state case law interpreting a tribe's inherent authority.

¶37 I respectfully dissent.

C. JOHNSON and CHAMBERS, JJ., concur with OWENS, J.

Reconsideration denied December 27, 2011.