**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>JOSHUA JAMES COOLEY,<br>*Defendant-Appellee*. | No. 17-30022<br><br>D.C. No.<br>1:16-cr-00042-<br>SPW-1<br><br>OPINION |

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted May 14, 2018
Seattle, Washington

Filed March 21, 2019

Before: Marsha S. Berzon, Stephanie Dawn Thacker,* and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Berzon

---

*The Honorable Stephanie Dawn Thacker, United States Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's order granting a motion to suppress evidence obtained as a result of the defendant's encounter with a Crow Indian Reservation police officer while the defendant's truck was parked on the shoulder of United States Route 212, which is a public right-of-way that crosses the Reservation.

The panel held that the district court's holding regarding the officer's lack of authority was correct, but the basis for its conclusion — that the defendant "seemed to be non-Native" — was not. The panel explained that officers cannot presume for jurisdictional purposes that a person is a non-Indian — or an Indian — by making assumptions based on physical appearance. The panel wrote that an officer can rely on a detainee's response when asking about Indian status, but that the officer posed no such question to the defendant. The panel held that the officer exceeded his authority as a tribal officer on a public, nontribal highway crossing a reservation when he detained the defendant and twice searched the truck without having ascertained whether the defendant was an Indian.

The panel held that the exclusionary rule applies in federal court prosecutions to evidence obtained in violation of the Indian Civil Rights Act's Fourth Amendment counterpart.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel agreed in the main, but with a caveat, with the district court's determination that the officer violated the ICRA's Fourth Amendment analogue by seizing the defendant, a non-Indian, while operating outside the Crow Tribe's jurisdiction. The panel wrote that a tribal officer does not *necessarily* conduct an unreasonable search or seizure for ICRA purposes when he acts beyond his tribal jurisdiction, but that the tribal authority consideration is highly pertinent to determining whether a search or seizure of unreasonable under ICRA. The panel explained that tribal officers' extra-judicial actions do not violate the ICRA's Fourth Amendment parallel only if, under the law of a founding era, a private citizen could lawfully take those actions. Under this standard, the panel concluded that the officer violated the ICRA's Fourth Amendment parallel when he twice searched the defendant's truck after seizing him.

## COUNSEL

Leif M. Johnson (argued), Assistant United States Attorney, Office of the United States Attorney, District of Montana, Billings, Montana, for Plaintiff-Appellant.

Eric Ryan Henkel (argued), Cotner Law, PLLLC, Missoula, Montana, for Defendant-Appellee.

**OPINION**

BERZON, Circuit Judge:

At around one in the morning, Joshua James Cooley and his young child were parked in a white truck on the westbound shoulder of United States Route 212, within the Crow Indian Reservation in southern Montana.[1]  James D. Saylor, a highway safety officer for the Crow Police Department, passed Cooley's truck while driving eastbound on Route 212.  Saylor regularly found motorists on the highway in need of assistance.  He also knew that this particular section of Route 212 lacked consistent cellphone reception.

Saylor turned around and pulled up behind the truck.  He left his patrol car and approached the driver's side of the truck.  The truck's engine was running; its headlights were on.  The truck's windows were closed and tinted, and the truck appeared to be on a raised suspension.  So it was difficult for Saylor to see into the passenger compartment.

Saylor knocked on the side of the truck.  When he did that, the rear driver's side window briefly lowered, then went up again.  Saylor shined his flashlight into the driver's side front window and saw Cooley making a thumbs-down sign with his right hand.

Saylor next asked Cooley to lower his window.  Cooley complied — he lowered the front driver's side window around six inches, just enough for Saylor to see the top of his

---

[1] The facts presented here come largely from the district court's order granting the motion to suppress, but include material from Saylor's testimony at the hearing held on Cooley's motion to suppress and from the police report Saylor wrote after the encounter with Cooley.

face.  According to Saylor, Cooley had "watery, bloodshot eyes," and "seemed to be non-native."  Saylor also noticed a young child climbing from the back seat of the truck into the front.

Cooley told Saylor that everything was okay — he had stopped driving just because he was tired, "which isn't uncommon" in Saylor's experience.  "A lot of travelers go through that particular stretch of highway," Saylor testified, "and they will pull over because of various reasons, tired, bathroom, et cetera."

But Saylor did not leave at that point.  Instead, he asked Cooley more questions.  In response, Cooley reported that he had come from the town of Lame Deer, which is around 26 miles from where the truck was stopped; he was in town to purchase a vehicle from a man named Thomas; and he was not sure of Thomas's last name, but it may have been Spang or Shoulder Blade.  Saylor knew men with both names — Thomas Spang and Thomas Shoulder Blade: Shoulder Blade had been a tribal officer for the Northern Cheyenne tribe; Saylor believed Spang was associated with drug trafficking.

Cooley's explanations did not add up for Saylor, and he conveyed that sentiment to Cooley.  In response, Cooley "became agitated and stated[,] '[I] don't know how it doesn't make any sense, I told you I cam[e] up to buy a vehicle.'"  At some point during this conversation, Cooley brought his child onto his lap.

According to Saylor, as this exchange continued Cooley's hands started to shake.  He "began to speak in a lower volume[,] making it difficult . . . to hear him."  And he started to take long pauses before answering questions.

Saylor asked Cooley to lower the front window further. When Cooley did so, Saylor noticed what appeared to be two semiautomatic rifles on the front passenger seat of the truck. But "just having weapons in a vehicle, especially in Montana, isn't cause for too much alarm, in my mind," Saylor testified.

Still, Saylor continued to ask Cooley about why he had traveled to Lame Deer. At some point during this additional questioning, Saylor asked Cooley for written identification. Instead of retrieving his identification, Cooley twice pulled small bills from his right pocket and placed them in the truck's center console.

Cooley then put his hand in his pocket yet another time. His breathing became shallow and rapid, according to Saylor, and Cooley "stared straight forward out of the windshield of his truck, as if he was looking through his" child. Saylor testified that such a "thousand-yard" stare is, to him, an indication that a suspect is possibly about to use force. So, while Cooley's hand was in his pocket, Saylor unholstered his pistol, drew the pistol to his side, and ordered Cooley to stop what he was doing and show his hands. Cooley complied. Saylor then again ordered Cooley to provide him with his identification; this time, Cooley handed over his Wyoming driver's license.

Saylor attempted to call in Cooley's license number to dispatch but failed, as he was unable to connect. When he then moved to the other side of the truck and opened the passenger side door, Saylor noticed a loaded semiautomatic pistol in the area near Cooley's right hand. Asked why he had not mentioned the pistol earlier, Cooley stated that he did not know the pistol was there. Saylor then took the pistol and disarmed it.

At that point, Saylor ordered Cooley to get out of the truck, which he did.  After conducting a pat down, Saylor escorted Cooley and his child to the patrol car.  Once there, Cooley took some more of his belongings out of his pocket — this time, a few small, empty plastic bags — and placed them on the hood of Saylor's car.  In Saylor's experience, such bags are commonly used to package methamphetamine.

Saylor then placed Cooley in the back of his patrol car and called for additional assistance from Crow Reservation officers.  He also called for assistance from Bighorn County officers, because Cooley "seemed to be non-[n]ative." While waiting for backup, Saylor returned to the truck to turn off the engine: There, he found in the cab a glass pipe and a plastic bag that appeared to have methamphetamine in it.

After County and Bureau of Indian Affairs officers arrived, the Bureau of Indian Affairs officer directed Saylor to conduct an additional search of the truck.  He did, and discovered more methamphetamine.

Cooley was charged in the District of Montana with one count of possession with intent to distribute methamphetamine, under 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime, under 18 U.S.C. § 924(c)(1)(A).  He moved to suppress evidence obtained as a result of his encounter with Saylor.  The motion argued that Saylor was acting outside the scope of his jurisdiction as a Crow Tribe law enforcement officer when he seized Cooley, in violation of the Indian Civil Rights Act of 1968 ("ICRA").

The district court granted Cooley's motion.  It determined that Saylor had identified Cooley as a non-Indian "when Cooley initially rolled his window down," and that

Saylor seized Cooley when he drew his gun, ordered Cooley to show his hands, and demanded his driver's license. The court reasoned that a tribal officer cannot detain a non-Indian on a state or federal right-of-way unless it is apparent at the time of the detention that the non-Indian has been violating state or federal law, and that Saylor therefore had no authority to seize Cooley when and where he did. The district court also concluded that ICRA, which contains language mirroring the Fourth Amendment, requires suppression in federal court of evidence obtained by tribal officers in violation of ICRA.

The government appealed the order under 18 U.S.C. § 3731. We review the factual findings underlying the district court's determination for clear error and the ultimate grant or denial of a motion to suppress de novo. *United States v. Zapien*, 861 F.3d 971, 974 (9th Cir. 2017).

## I

We consider first whether the district court correctly determined that Saylor exceeded his jurisdiction in detaining Cooley. We cannot agree that Saylor appropriately determined that Cooley was a non-Indian just by looking at him. But Saylor did act outside of his jurisdiction as a tribal officer when he detained Cooley, a non-Indian, and searched his vehicle without first making any attempt to determine whether Cooley was in fact an Indian.

## A

An Indian tribe's authority to enforce criminal laws on tribal land is nuanced. On tribal land, a tribe has inherent powers as a separate sovereign to enforce criminal laws, but only as to its tribal members and nonmember Indians. *United States v. Lara*, 541 U.S. 193, 197–99 (2004). An

Indian tribe's authority over non-Indians is more limited. A tribe has no power to enforce tribal criminal law as to non-Indians, even when they are on tribal land.**[2]** *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195 (1978). But a tribe may exclude non-Indians from tribal land. *Duro v. Reina*, 495 U.S. 676, 696–97 (1990). Therefore, tribal officers can investigate crimes committed by non-Indians on tribal land and deliver non-Indians who have committed crimes to state or federal authorities. *Id.* Thus, "tribes retain considerable control over non-member conduct on tribal land." *Strate v. A-1 Contractors*, 520 U.S. 438, 454 (1997).

Tribes have less power over non-Indians on public rights-of-way that cross over tribal land — such as Route 212 — than on non-encumbered tribal property. If a tribe has granted an easement allowing public access to tribal land, the tribe cannot exclude non-Indians from a state or federal highway constructed on that easement. *See Strate*, 520 U.S. at 454–56. Tribes also lack the ancillary power to investigate non-Indians who are using such public rights-of-way. *See Bressi*, 575 F.3d at 895–96. But where, as here, a public highway is within the boundaries of a tribal reservation, tribal authorities may arrest Indians who violate tribal law on the public right-of-way. *Strate*, 520 U.S. at

---

**[2]** Tribal officers are often delegated authority by a state or the federal government to act broadly on its behalf. *See, e.g.*, *Bressi v. Ford*, 575 F.3d 891, 894, 897 (9th Cir. 2009); *see also United States v. Wilson*, 699 F.3d 235, 239 (2d Cir. 2012) (noting that tribal officers "had full authority to act as New York police officers within the boundaries of the St. Regis Reservation" under New York law, and that some tribal officers were cross-designated as United States customs officers); *Olson v. N.D. Dep't of Transp.*, 909 N.W.2d 676, 681–82 (N.D. 2018), *State v. Eriksen*, 259 P.3d 1079, 1083 (Wash. 2011). The limitations discussed here do not apply to deputized officers. *See Bressi*, 575 F.3d at 894, 897; *Eriksen*, 259 P.3d at 1083.

456; *Bressi*, 575 F.3d at 896; *see also* 18 U.S.C. § 1151 (defining Indian country as including rights-of-way within Indian reservations).

Finally, tribal authorities may stop those suspected of violating tribal law on public rights-of-way as long as the suspect's Indian status is unknown. In such circumstances, tribal officials' initial authority is limited to ascertaining whether the person is an Indian. *Bressi*, 575 F.3d at 896; *see also United States v. Patch*, 114 F.3d 131, 134 (9th Cir. 1997). The detention must be "a brief [and] limited" one; authorities will typically need "to ask one question" to determine whether the suspect is an Indian. *Patch*, 114 F.3d at 134. If, during this limited interaction, "it is apparent that a state or federal law has been violated, the [tribal] officer may detain the non-Indian for a reasonable time in order to turn him or her over to state or federal authorities."**[3]** *Bressi*, 575 F.3d at 896; *see also Strate*, 520 U.S. at 456 n.11.

We have not elaborated on when it is "apparent" or "obvious" that state or federal law is being or has been violated. *Bressi*, 575 F.3d at 896–97. But *Bressi* made clear that the power to detain non-Indians on public rights-of-way for "obvious" or "apparent" violations of state or federal law

---

**[3]** *Bressi* held that "a roadblock on a public right-of-way within tribal territory, established on tribal authority, is permissible only to the extent that the suspicionless stop of non-Indians is limited to the amount of time, and nature of inquiry, that can establish whether or not they are Indians." 575 F.3d at 896–97. The government contends that *Bressi* applies only to roadblocks. The government's cabined reading of *Bressi* is not persuasive. Although *Bressi* involved a roadblock, the opinion sets forth general principles governing the scope of tribal officers' authority to seize and question on a public right-of-way within an Indian reservation non-Indians and those whose Indian status is unknown. *Id.* at 896.

does not allow officers to search a known non-Indian for the purpose of finding evidence of a crime.  *Id.*

## B

Here, the district court noted that when Saylor first observed Cooley through the truck's partially open driver's window, Cooley "seemed to be non-Native," and held that Saylor had no authority to detain Cooley from thenceforward.  The holding regarding Saylor's lack of authority was correct, but the district court's basis for its conclusion — how Cooley looked to Saylor — was not.

Saylor never asked Cooley whether he was an Indian or otherwise ascertained that he was not.  Instead, he reached a conclusion about Cooley's status as a non-Indian based on physical appearance alone.  Officers cannot presume for jurisdictional purposes that a person is a non-Indian — or an Indian — by making assumptions based on that person's physical appearance.

Indian status is a political classification, not a racial or ethnic one.  Indian status requires only "(1) proof of some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe, and (2) proof of membership in, or affiliation with, a federally recognized tribe."  *United States v. Zepeda*, 792 F.3d 1103, 1113 (9th Cir. 2015) (en banc).  A person can have significant Native American ancestry and nonetheless not be an Indian for tribal law enforcement purposes.  *See id.* at 1114.  And a person can be an Indian for tribal law enforcement purposes even if that person does not have any of the physical characteristics associated with Native American heritage. *See United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005); William C. Canby, Jr., *American Indian Law in a Nutshell* 9–11 (6th ed. 2014).  *United States v. Antelope*,

emphasized this distinction, explaining that the Indian defendants "were not subjected to federal criminal jurisdiction because they [were] of the Indian race but because they [were] enrolled members of the Coeur d'Alene Tribe." 430 U.S. 641, 646 (1977).

A law enforcement officer can, of course, rely on a detainee's response when asked about Indian status. *See Patch*, 114 F.3d at 134. But Saylor posed no such question to Cooley.

Nonetheless, his assumption based on physical appearance aside, Saylor did exceed his legal authority as a Crow officer during the interaction with Cooley. The district court correctly found that Saylor seized Cooley when he drew his weapon and ordered him to provide identification.[4] Although Saylor had been questioning Cooley for a significant period by that point, he had not asked Cooley whether he was an Indian. Yet, still not having ascertained whether Cooley was an Indian, Saylor detained Cooley and twice searched his truck. Continuing to detain — and searching — a non-Indian without first attempting to ascertain his status is beyond the authority of a tribal officer on a public, nontribal highway crossing a reservation. *See Bressi*, 575 F.3d at 896; *see also Strate*, 520 U.S. at 456.

## II

Because we conclude that Saylor acted outside his authority as a tribal officer when he seized Cooley and later twice searched Cooley's truck, we next must consider

---

[4] As the issue has not been raised, we do not address whether there was a seizure earlier in the encounter.

whether the district court properly suppressed the evidence obtained during the searches.

## A

The district court held that the exclusionary rule applies in federal court to violations of ICRA's Fourth Amendment counterpart. The government agrees, stating in its opening brief that "suppression of evidence in a federal proceeding would be appropriate if the [officer's] conduct violated ICRA," quoting *United States v. Becerra-Garcia*, 397 F.3d 1167, 1171 (9th Cir. 2005).[5] We also agree with the district court, but because *Becerra-Garcia* did not squarely decide the exclusionary rule issue, we address it.

The Fourth Amendment expressly limits federal power to conduct searches and seizures, and equally limits state power to do so via its incorporation into the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 650 (1961). But the Fourth Amendment — like the rest of the Bill of Rights — "does not apply to Indian tribal governments." *Duro*, 495 U.S. at 693 (citing *Talton v. Mayes*, 163 U.S. 376 (1896)); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 57 (1978).

"[H]owever, Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Santa Clara Pueblo*, 436 U.S. at 56. The Indian Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 73, enacted pursuant to that authority, "impos[es] certain restrictions upon tribal governments

---

[5] Likewise, the government does not argue that the district court erred in applying exclusionary rules principles in this case. Thus, we have no occasion to consider whether any exception to the exclusionary rule applies in this context.

similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment." *Santa Clara Pueblo*, 436 U.S. at 57; *see also* 25 U.S.C. § 1302(a).

Before ICRA, Indian litigants could not "claim protection from illegal search and seizure protected by the [F]ourth [A]mendment." S. Rep. No. 90-841, at 10 (1967). To address that concern, ICRA includes a prohibition on unreasonable searches and seizures nearly identical to the prohibition in the Fourth Amendment. *See United States v. Lester*, 647 F.2d 869, 872 (8th Cir. 1981). The section of ICRA parallel to the Fourth Amendment states:

> No Indian tribe in exercising powers of self-government shall . . . violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

25 U.S.C. § 1302(a)(2).

This parallelism does not directly settle whether the exclusionary rule applies to violations of § 1302(a)(2). The exclusionary principle is a "judicially created rule . . . designed to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Herring*, 555 U.S. 135, 139–40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)); there is no language in the Fourth Amendment — or its ICRA counterpart — alluding to it. But the exclusionary principle is now firmly embedded in our judicial tradition, interwoven with our understanding of the Fourth Amendment's protections. As the Supreme Court

wrote in 1914, "[i]f letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the [Fourth] Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution." *Weeks v. United States*, 232 U.S. 383, 393 (1914).[6]

Congress enacted language in ICRA that mirrors the Fourth Amendment's protections, and it expressed concern that tribal authorities were violating the protections of that Amendment. The exclusionary rule would play the identical safeguarding function for subsection (a)(2) of ICRA, as it does for the Fourth Amendment. Given that the exclusionary rule applied in federal court to both state and federal Fourth Amendment violations at the time ICRA was enacted and was understood as essential to the effective functioning of the Fourth Amendment, the most reasonable inference is that the substantive parallelism between the Fourth Amendment and ICRA continues at the remedy level. The exclusionary rule therefore applies in federal court prosecutions to evidence obtained in violation of ICRA's

---

[6] In *Weeks*, the Court applied the exclusionary rule only to violations of the Fourth Amendment by federal officers and only to prosecutions in federal court. 232 U.S. at 398. After determining that the Fourth Amendment binds the states via the Fourteenth Amendment in *Wolf v. Colorado*, 338 U.S. 25 (1949), the Court then held that the exclusionary rule for evidence sought to be introduced in federal court applies to evidence seized by state officers in violation of the Fourth and Fourteenth Amendments. *Elkins v. United States*, 364 U.S. 206, 213–15, 223 (1960). The next year, in *Mapp*, the Court held that the exclusionary rule also applies to state court proceedings. 367 U.S. at 655.

Fourth Amendment counterpart. We have previously so assumed, *see Becerra-Garcia*, 397 F.3d at 1171, *United States v. Manuel*, 706 F.2d 908, 911 & n.3 (9th Cir. 1983), and now so hold.[7]

## B

The district court determined that Saylor violated ICRA's Fourth Amendment analogue by seizing Cooley, a non-Indian, while operating outside the Crow Tribe's jurisdiction. We agree in the main, but with a caveat. In our view, a tribal officer does not *necessarily* conduct an unreasonable search or seizure for ICRA purposes when he acts beyond his tribal jurisdiction. But the tribal authority consideration is highly pertinent to determining whether a search or seizure is unreasonable under ICRA. And in this case, taking into account both the jurisdictional defect and other factors, Saylor violated ICRA's Fourth Amendment counterpart.

## 1

We rely on Fourth Amendment jurisprudence to analyze the validity of a search or seizure under ICRA. *See Becerra-Garcia*, 397 F.3d at 1171. Whether a search or seizure is unreasonable under the Fourth Amendment often depends on whether the officer had probable cause for a search or arrest, or reasonable suspicion for an investigatory detention. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *Illinois v. Gates*, 462 U.S. 213, 243–44 (1983), *Terry v. Ohio*, 392 U.S. 1, 27–28 (1968). In some circumstances,

---

[7] We do not decide whether the exclusionary rule also applies in tribal court proceedings to evidence obtained in violation of ICRA's Fourth Amendment analogue. *Cf. Elkins*, 364 U.S. at 213–15, 223.

however, a search or seizure may be unreasonable even if the officer had sufficient substantive grounds to conduct it. *See, e.g.*, *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995); *Payton v. New York*, 445 U.S. 573, 586 (1980); *see also Wilson*, 699 F.3d at 245.

*United States v. Henderson*, 906 F.3d 1109 (9th Cir. 2018), a case somewhat analogous to this one, recently addressed such a circumstance. In *Henderson*, a magistrate judge in the Eastern District of Virginia signed off on a so-called "network investigative technique" ("NIT") warrant, which allowed the Federal Bureau of Investigation to obtain the IP address for computers "*wherever located*" that connected to a site suspected of distributing child pornography. *Id.* at 1112. Using this NIT warrant, the FBI identified the IP address of "a computer at the San Mateo, California, home of Bryan Henderson's grandmother, with whom Henderson lived." *Id.* at 1112. The FBI obtained a separate warrant to search the grandmother's home. *Id.* That search uncovered child pornography belonging to Henderson. *Id.* at 1112–13.

*Henderson* held that the initial NIT warrant violated Federal Rule of Criminal Procedure 41(b), which at the time authorized magistrates to "issue a warrant to search for and seize a person or property located *within the district*" of that magistrate.[8] *Id.* at 1113 (quoting Fed. R. Crim. P. 41(b)(1)). *Henderson* further decided that because the magistrate violated Rule 41(b), she had exceeded her jurisdictional authority. The magistrate's only jurisdictional basis for issuing the NIT warrant was 28 U.S.C. § 636, which allows

---

[8] Rule 41(b) was subsequently amended to allow magistrates to issue warrants like the one at issue in *Henderson*. *Id.* at 1119; Fed. R. Crim. P. 41(b)(6).

magistrates "to exercise 'all powers and duties conferred or imposed' by the Federal Rules of Criminal Procedure," *id.* at 1115 (quoting 28 U.S.C. § 636(a)(1)). The magistrate was not exercising a power conferred or imposed by those Rules, as her issuance of a warrant for a search outside her district exceeded Rule 41(b)'s authorization. *Id.*

Because "the magistrate judge issued a warrant in excess of her jurisdictional authority," *Henderson* concluded, the search supported by the NIT warrant violated the Fourth Amendment. *Id.* at 1116. In reaching this conclusion, *Henderson* relied on the well-settled principle that the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted." *Id.* (quoting *United States v. Jones*, 565 U.S. 400, 411 (2012)). When assessing the protections afforded at the Amendment's adoption, courts examine the protections provided by "statutes and common law of the founding era." *Moore*, 553 U.S. at 168; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001). *Henderson* determined that under the common law of the founding era, a search was unreasonable unless the warrant authorizing that search was issued by "a court or magistrate empowered by law to grant it." 906 F.3d at 1116 (quoting Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 210 (1880)).

The common law of the founding era often deemed searches and seizures unreasonable when police officers acted outside the bounds of their sovereign's jurisdiction. When the Fourth Amendment was adopted, the common law drew clear distinctions based on whether an officer was acting within or outside the scope of his sovereign's authority. When attempting to execute a warrant, for example, an officer could execute the warrant only "so far as

the jurisdiction of the magistrate and himself extends." *Henderson*, 906 F.3d at 1116 (quoting 4 William Blackstone, *Commentaries* \*291). And "[a]t common law, an officer [could not] arrest a person outside of his precinct, even though the offense was committed within it." 2 David S. Garland & Licius P. McGehee, *The American and English Encyclopaedia of Law* 863 (2d ed. 1896).

The Constitution provides support for the principle that police officers' legitimate power was limited under the common law by the jurisdictional reach of the sovereign that officer served. The Extradition Clause requires states to comply with requests made by other states to extradite accused felons. U.S. Const. art. IV, § 2, cl. 2; *see also Puerto Rico v. Branstad*, 483 U.S. 219, 226 (1987); *Engleman v. Murray*, 546 F.3d 944, 949 (8th Cir. 2008). This requirement necessarily rests on the assumption that one state's officers could not lawfully seize a felon in another state, regardless of where the felony had been committed.

At the same time, under the common law of the founding era, an officer operating without any sovereign authority could lawfully conduct a seizure in limited circumstances. At the time of the Fourth Amendment's adoption, private individuals who personally observed the commission of a felony could lawfully seize the perpetrator. 4 Blackstone, *supra*, at \*293; *see also* Garlan & McGehee, *supra*, at 884–89. Officers had this same power when operating outside their sovereign's jurisdiction. 4 Blackstone, *supra*, at \*293. Under the historical approach relied upon in *Henderson* (and many other cases, *see, e.g.*, *Moore*, 553 U.S. at 168–69), a seizure of a felon by an officer acting outside of the scope of his sovereign's authority may be reasonable if the common law would allow a private person to seize the felon in the

same circumstances.**[9]**  This principle roughly comports with our holding in *Bressi* — that tribal officers can seize non-Indians on a state highway within Indian territory who have *obviously* committed a crime, even when the officers have no authority to exclude the perpetrator from Indian territory. 575 F.3d at 896.

The Tenth and Third Circuits, outside the context of tribal authority, have suggested that a state officer does not violate the Fourth Amendment by seizing a suspect in another state.**[10]**  *See United States v. Jones*, 701 F.3d 1300, 1309–10 (10th Cir. 2012); *United States v. Sed*, 601 F.3d

---

**[9]** A private citizen's ability to seize felons at common law did not also provide private citizens the ability to conduct searches.  *See* 4 Blackstone, *supra*, at *293; *cf. Bressi*, 575 F.3d at 896.

**[10]** *Jones* and *Sed* both involved officers who unwittingly seized a felon across state lines.  *Jones*, 701 F.3d at 1305; *Sed*, 601 F.3d at 226–27; *see also Engleman*, 546 F.3d at 946, 949 (same).  Saylor took no such unwitting actions.  He assumed that Cooley was a non-Indian, yet continued to investigate him, detain him, and search his possessions.  We do not today address circumstances in which, for example, a tribal officer asks whether the individual is an Indian and is told, incorrectly, that he is.

We also do not address whether an officer violates the Fourth Amendment when conducting a search or seizure in another political subdivision of the same state.  *See Rose v. City of Mulberry*, 533 F.3d 678, 680 (8th Cir. 2008); *Pasiewicz v. Lake Cty. Forest Preserve Dist.*, 270 F.3d 520, 526 & n.3 (7th Cir. 2001).  We leave open as well whether there are other circumstances in which an officer may comply with the Fourth Amendment even if acting outside his geographical authority — for example, if in hot pursuit of a suspect or in another exigent circumstance he arrests a suspect.  *See Patch*, 114 F.3d at 134; *United States v. Goings*, 573 F.3d 1141 (11th Cir. 2009); *Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990); *Eriksen*, 259 P.3d at 1083 n.6.

224, 228 (3d Cir. 2010); *but see Ross*, 905 F.2d at 1354 (holding that a warrantless arrest by a state officer within Indian country violated the Fourth Amendment). But, the defendants in both *Jones* and *Sed* principally argued that their arrests violated the Fourth Amendment because those arrests violated state law. *Jones*, 701 F.3d at 1308–09 (relying on *Moore*, 553 U.S. at 176); *Sed*, 601 F.3d at 228 (same). Those courts rightly rejected that argument; it is well-established that a search is not unreasonable under the Fourth Amendment simply on the ground that the search violated state statutes.[11] *Jones*, 701 F.3d at 1309–10; *Sed*, 601 F.3d at 228; *see also Moore*, 553 U.S. at 176; *Goings*, 573 F.3d at 1143.

In this case, however, the problem is not that the tribal officer was acting in violation of state (or federal) law. The divisions between tribal authority on the one hand, and federal and state authority on the other, have deep roots that trace back to the nation's founding. Whether a tribal officer's actions violate ICRA's Fourth Amendment analogue does not turn on whether his actions are lawful under current statutory law. Rather, the limitations on tribal authority derive from the recognition that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory; they are a separate people possessing the power of regulating their internal and social relations." *Antelope*, 430 U.S. at 645 (internal citations and quotation marks omitted). The tribes

---

[11] The defendants in *Jones* and *Sed* did not, it appears, present a historical analysis similar to the one in *Henderson*. That analysis demonstrates that the common law of the founding era, not contemporary statutory law, is most pertinent to whether a search by an officer acting beyond his sovereign's power is invalid under the Fourth Amendment. We therefore do not read *Jones* and *Sed* as inconsistent with *Henderson*.

are "separate sovereign[s]" that possess the "inherent or sovereign authority" over tribal members and other Indians, *Lara*, 541 U.S. at 197, but not others. Consistent with the fundamental nature of the sovereignty concepts governing the scope of tribal authority, the Tenth Circuit in *Ross* held that state officers violate the Fourth Amendment if they make an arrest in tribal territory. 905 F.2d at 1352–54; *see also Jones*, 701 F.3d at 1311–12.

In sum, when a tribal officer exceeds his tribe's sovereign authority, his actions may violate ICRA's Fourth Amendment counterpart because, when the Fourth Amendment was adopted, officers could not enforce the criminal law extra-jurisdictionally in most circumstances. The tribal officers' extra-jurisdictional actions do not violate ICRA's Fourth Amendment parallel only if, under the law of the founding era, a private citizen could lawfully take those actions. Whether the officer's actions violate current state, federal, or tribal law is not the fulcrum of this inquiry. *Moore*, 553 U.S. at 176.

## 2

There is also no doubt that under the standard we have set forth, Saylor violated ICRA's Fourth Amendment parallel when he twice searched Cooley's truck after seizing him. At those times, Saylor was acting outside the tribe's jurisdictional authority. Under the law of the founding era, Saylor would not have had authority as a private citizen to seize Cooley and detain him in his patrol car until state or federal officers arrived on the scene, as it was not obvious to that point that a crime had been or was being committed. In any event, Saylor lacked authority, by analogy to a private person, to return to Cooley's truck and enter the car to retrieve the rifles still in the truck, or to search the truck a second time. *See supra* 18–22 & n. 9.

### III

We affirm the district court's grant of the motion to suppress evidence.  Saylor exceeded his jurisdictional authority when he twice searched Cooley's truck. We hold that the exclusionary rule applies to violations of ICRA's Fourth Amendment counterpart, and that Saylor violated ICRA's Fourth Amendment parallel.  Suppression of the fruits of this unlawful search was therefore proper.

**AFFIRMED, AND REMANDED.**